### Gannon v. Bronston.

(Decided Dec. 16, 1932.)

L. G. CAMPBELL for appellant.

L. F. ZERFOSS for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

Appellant sued Bronston upon a note; he was unsuccessful, and has appealed. This is the note sued on:

"$500.00          Lexington, Ky.          Nov. 15, 1915.

"One Hundred Eighty days after date we promise to pay to the order of T. F. Gannon Five Hundred Dollars for value received, negotiable and payable at Second National Bank, Lexington, Ky., with interest at the rate of 6 per cent. per annum from date until paid.

"P. D. Foster,
"J. M. Bronston,
"Fred D. Foster."

The petition is in proper form, and demurrer to it was properly overruled.

Bronston in his answer admitted the execution of the note; then said, in substance: That he and the two Fosters were partners engaged in the retail meat business, and they had executed this note to Gannon for stock sold the partnership; that shortly after its maturity this partnership got into financial difficulties and these partners were contemplating bankruptcy; that it was then agreed among them and with Gannon for Bronston to surrender his interest in the meat business to the Fosters and to retire from the partnership, for the Fosters to continue the business and to assume and pay the whole of this note, and for Gannon to so accept them and to release Bronston from all obligation on this note. His answer concludes as follows:

"Defendant says that he relied on the assurances of the plaintiff to release him from further obligation on the note sued on, and that P. D. Foster and Fred D. Foster would pay same, and relying on the promise of plaintiff to release him on said note, that he quit the business conducted by Bronston and the Fosters and since that time paid no further attention to it and thereby lost his

interest therein and that to all the facts above stated the plaintiff was fully cognizant and fully agreed to the arrangement without reservation.

"Wherefore Defendant prays that plaintiff's petition be dismissed, for his costs and for all other proper relief."

From this it will be seen Bronston is pleading a release from obligation on this note, and is pleading that Gannon is estopped to assert same against him. Bronston does not use the word "estoppel" in this plea, but he does plead facts which, if true, would constitute an estoppel.

Gannon's demurrer to this answer was overruled, and this he alleges was error, because, as he contends, the execution of this release was not alleged to have been done with the formality required by section 3720b-122, Ky. Stats., which we will discuss later.

In the first paragraph of his reply, Gannon denied everything asserted in the answer, and in a second paragraph he pleaded:

"That he never at any time received from the defendant any consideration for the alleged so-called release, and it is not, and was not in writing, and is therefore invalid, and void in law, nor was the note sued on delivered up."

Bronston denied Gannon's plea of no consideration, and the case went to trial before a jury. The witnesses for the defense were Bronston and Fred D. Foster, and their testimony supported all the allegations of the answer. Gannon was the sole witness for himself. In his testimony, he denied everything testified to by witnesses for the defense, denied having had anything to do with getting Bronston out of this partnership, but said the first he knew of Bronston's retirement was on one Monday morning about May 15, 1916, when he asked about Bronston, and was told by Mr. P. D. Foster, "We got rid of him." He testified that the Fosters continued the business until September 1, 1917, then turned the shop over to him, that on October 17, 1917, the Fosters went into bankruptcy, and he had never received anything on this note from either of the Fosters or from Bronston, nor had he sought to make Bronston pay it until he filed this suit on September 9, 1930, although Bronston lived in the same town with him all that time.

The court gave the jury this instruction:

"The jury will find for the plaintiff T. F. Gannon in the sum of $500.00, with interest at six per cent. from November 15, 1915; unless you believe from the evidence that the plaintiff Gannon agreed with the defendant Bronston to accept P. D. Foster and Fred D. Foster as obligors and discharged Bronston, from further liability on said note."

The jury found for Bronston. Gannon's motion for a judgment notwithstanding the verdict was overruled, and thereupon he filed a motion for a new trial, upon that and divers other grounds, which was also overruled. All of these grounds are in essence merely different ways of saying this: Admitting Bronston and the Fosters as partners owed Gannon $500, an indebtedness they had contracted in the conduct of a retail meat business, and if it be true that the partners were not getting along harmoniously, were in financial difficulties, were contemplating bankruptcy, and at a meeting of the partners and Gannon it was orally agreed, if Bronston would surrender his interest and get out, that Gannon would release him and look to the Fosters for payment of the note and the Fosters agreed to this and undertook to pay the note, but after 15½ months of effort failed and have been discharged in bankruptcy, this release of Bronston is not valid for two reasons: First, because there was, so he says, no consideration moving to Gannon for making it; and, second, because the note was not then surrendered to either Bronston or the Fosters, nor was this release evidenced by any writing whatever. Based on this, Gannon contends the court erred in overruling his demurrer to Bronston's answer because Bronston had not alleged that Gannon's agreement to release him was in writing, erred in overruling his motion for a directed verdict because Bronston did not allege or prove this alleged agreement was in writing, and erred in overruling his motion made under section 386 of the Code of Practice in Civil Cases for a judgment notwithstanding the verdict because, Bronston having failed to allege this agreement to release him was in writing, the pleadings, as Gannon construes them, entitle him to a judgment.

Consideration for making this agreement sufficiently appears in both the pleadings and the proof. It is true Gannon got no money by it, but he got what

he wanted; he got what he bargained for; he got Bronston out of this partnership, which he then hoped would result in such restoration of harmony that the Fosters would make a success of it and would be able to pay his note.

Gannon is alleged to have released Bronston in return for Bronston's retirement from the partnership then existing between him and the Fosters; thus the situation is squarely within the definition of consideration and its sufficiency given in Restatement of the Law, subject "Contracts." "Sec. 75. Consideration for a promise is * * * the creation, modification or destruction of a legal relation * * * bargained for and given in exchange for the promise."

There was evidence such a promise was made and that pursuant thereto Bronston retired from the partnership, and, if this evidence be true, and the jury has found it is, the contract was then complete, for, in the subject of "Contracts," in the Restatement of the Law, it is written:

"Sec. 74. A contract is made at the time when the last act necessary for its formation is done, and at the place where that final act is done."

The doing by the promisee of something lawful which he does not otherwise have to do is sufficient consideration to support the agreement of the promisor. For example, see Talbott v. Stemmons' Ex'r, 89 Ky. 222, 12 S. W. 297, 11 Ky. Law Rep. 451, 5 L. R. A. 856, 25 Am. St. Rep. 531, where an agreement, of Mrs. Stemmons to pay her grandson $500 if he would discontinue the use of tobacco was upheld. See, also, 13 C. J. p. 315, sec. 150, and 6 R. C. L. p. 652 et seq., secs. 66, 67, 68, etc., and Hamer v. Sidway, 124 N. Y. 538, 27 N. E. 256, 12 L. R. A. 463, 21 Am. St. Rep. 693.

The surrender by Bronston of his interest in this partnership was sufficient consideration to support Gannon's agreement to release him on this note, if Gannon made such an agreement, and the jury has found that he did; so the defense of no consideration is without merit.

The facts in this case cannot be distinguished from the facts in Akers v. Phillips, 58 S. W. 790, 22 Ky. Law Rep. 813, and the instruction in this case compares most favorably with the instruction in the Akers Case;

hence this judgment must be affirmed unless some change has been made in our laws since the Akers Case was written.

The change in our law which it is claimed makes the Akers Case no longer applicable is found in our Negotiable Instruments Law (Acts 1904, c. 102); the particular section relied on being section 122 thereof, which is section 3720b-122, Ky. Stats., which we are now copying and in doing so we shall italicize a portion, which it is claimed governs the question before us:

"The holder may expressly renounce his rights against any party to the instrument before, at or after its maturity. An absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument. But a renunciation does not affect the rights of a holder in due course without notice. *A renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon.*"

As we will want to refer to it later, we are going to give here a copy of section 62 of the English Bills of Exchange Act, adopted in 1882. See 45 and 46 Vict. c. 61, sec. 62:

"(1) When the holder of a bill at or after its maturity absolutely and unconditionally renounces his rights against the acceptor the bill is discharged.

"The renunciation must be in writing, unless the bill is delivered up to the acceptor.

"(2) The liabilities of any party to a bill may in like manner be renounced by the holder before, at, or after its maturity, but nothing in this section shall affect the rights of a holder in due course without notice of the renunciation."

Before going further, let us note that in the Negotiable Instruments Law the word "discharge" is used both as regards the instrument itself, as in sections 47, 51, 119, 120, 121, 122, 142, and 183, and as regards the parties to it, as in sections 23, 89, 120, 122, 142, 147, 174, 175, 176, 186, and 188. Let us note further that it makes provision by which some parties to a negotiable instrument may be discharged and the liability of others retained. See sections 48, 89, 120, 142, 174, 175, and 176, and let us keep in mind these provisions of the law

for a discharge of the instrument itself, as well as for a discharge of a party to the instrument. Let us further note there was never an objection interposed to any of this evidence whatever, and further that this note has never changed hands at all, and that plaintiff, Gannon, is both the original payee and present holder. Therefore this note is subject to the same defenses as if it were not negotiable. It is like any other simple contract. See section 3720b-58, Ky. Stats.

Bronston does not claim the insrtument has been discharged, or, perhaps to make our meaning clearer, has been extinguished, but merely that he has been discharged, or, to make our meaning clearer, has been released, by the oral agreement set out above, and our task is to determine if that can be done in view of the words we have italicized in the above-cited section 3720b-122, Ky. Stats. Before we undertake to answer this question, we want to set out as clearly as we can just what this alleged settlement is claimed to have done. We used the word "extinguished" above, and we did so advisedly, for we are going to compare this note to a lighted candle. While this candle remains lighted, the rays of light given by it would fall equally upon three men, Bronston and the two Fosters, and, so long as this note continued in force, it affected equally Bronston and the two Fosters. If the flame of the candle is extinguished, its rays cease, its power is gone, it affects no one, and, when a note such as this is discharged or extinguished, it no longer affects any one. In the one case the candle remains just as before, but the flame is gone; in the other case, the same paper, the same writing thereon, the same note, remains, but its vitality is gone, it affects no one; but no one claims that is what happened here, no one claims this note has been discharged or extinguished, but Bronston claims he has been released, and that is what he and Fred D. Foster testify was done, or, to carry this candle illustration a little further, he admits the candle is still burning, but claims that a shield has been erected so that now its rays fall not on him.

At this point we shall dispose of one of the contentions made by Gannon, which is that this claim asserted by Bronston did not accomplish the things claimed by Bronston (the release of Bronston on this note and the assumption of its payment by the Fosters), for two reasons, first, because, so Gannon con-

tends, the release of Bronston released the Fosters also; and, second, because an oral agreement by the Fosters to pay Bronston's indebtedness is made void by subsection 4 of section 470, Ky. Stats.

This contention is erroneous in both particulars. These four parties, Gannon, the creditor, and Bronston and the two Fosters, the debtors, were all sui juris and in every way capable of contracting with each other, and, when they agreed to this arrangement by which Bronston was released, that did not release the Fosters, since they desired it and agreed to it. See Marks v. Deposit Bank of Owensboro, 50 S. W. 1103, 21 Ky. Law Rep. 117; 23 R. C. L. p. 403, sec. 32, note 7. Before this agreement for the release of Bronston was reached, this $500 debt bore equally upon him and the two Fosters. Bronston was liable for the whole of it; each of the Fosters was liable for the whole of it. Gannon could have singled out any of the three and sued him and obtained a judgment for the whole of it. By the arrangement made, the Fosters did not undertake to pay the debt of another; they merely consented that Bronston might be released from joint obligation on this note with them.

This leaves but one of Gannon's contentions to be disposed of, which is that this release of Bronston is ineffectual because it was in parol only, and the note in question was not surrendered to any of the parties liable for its payment.

In the solution of this, we shall look briefly at what our fathers learned to know as "The Law Merchant," of which our Negotiable Instruments Law is a codification. No one can trace the law merchant or the lex mercatoria to its origin. Those interested in its history are referred to 8 C. J. p. 44, sec 31 et seq.; 3 R. C. L. p. 835, sec. 8; Daniels on Negotiable Instruments, sec. 1; and to the appendix in 3 Cranch. It is a part of the English common law, but no one can say when it became so. One of the provisions of Magna Charta (chapter 30) is for the protection of merchants in their "Old and rightful customs." The law merchant introduced rules and practices that to the lawyer, steeped in the principles of the common law, seemed to be quite anomalous. It has been said of it that "Established as it has been by ancient usage [the law merchant], is frequently arbitrary, and

not deducible from logical considerations." Farmers' National Bank v. Sutton Manufacturing Co. (C. C. A.) 52 F. 191, 194, 17 L. R. A. 595. It would perhaps be better to say that it is often impossible to give logical reasons for the rules of the law merchant because they result from our adherence to precedents founded when made upon plain and valid reasons that are now lost in the twilight of antiquity.

Before its codification, one desiring to learn the law merchant had to roam through a vast field of authority and pick it out as he might find it here and there by a minute examination of prior decisions.

It was first codified in France in 1673, and that Code has been made the basis of similar Codes, by all the commercial nations of Europe.

The particular question in which we are interested is there thus expressed: "Les obligations s'eteignent, par la paiement, par la novation, par la remise volontaire." See French Civil Code Annotated by Blackwood Wright, c. 5, art. 1234. This French sentence means: Obligations are extinguished, by payment, by novation, and by voluntary relinquishment.

By construction, payment had come to mean payment by the principal debtor, and the principal debtor is the man or men who, having paid the instrument, can make no claim against any other man or men for the payment of the whole of it. A discharge by payment is the result of an act of the debtor alone.

Novation means a new meeting of the minds, and an instrument is discharged by novation when the parties agree on some other contract to take its place. It is a new agreement, and includes a pure novation, an accord and satisfaction, a covenant not to sue, and a release. A discharge by novation results from acts of both debtor and creditor.

The final means for the discharge of instruments (voluntary relinquishment) is an act of the creditor alone. Thus there are three ways by which a negotiable instrument may be extinguished, by the debtor's paying it, by the creditor's relinquishing it, or both debtor and creditor may agree upon the substitution of some other contract in lieu of it.

No one attempted to codify the law merchant in England until 1882, when the Bills of Exchange Act was passed. About the beginning of this century the

Uniform Negotiable Instruments Law was adopted in this country. The subject-matter covered by the French with one sweeping sentence is divided in the English Bills of Exchange Act and covered by sections 59, 61, 62, 63, and other sections, and the same matter is covered by sections 119, 122, 123, and other sections, of the Uniform Negotiable Instruments Law.

The section that concerns us is our section 3720b-122. This section has been involved in litigation in other states, and concerning it and its meaning courts have arrived at two entirely different conclusions. The meaning of this section is determined by the meaning of the word "renunciation" as used therein. We will give here the two views by giving what seems to be the definition they have given of this word and the rules resulting therefrom.

### The Majority View.

Courts taking this view accept the definition of "renunciation" given in 54 C. J. p. 392, which is this:

> "Renunciation: In general, the act of giving up a right; the act of renouncing or giving up something possessed; the giving up of a right, the legal act by which a person abandons a right acquired, but without transferring it to another. The term imports a gratuitous abandonment or giving up of a right; an express waiver without consideration; and it is said not to import a release or discharge for a valuable consideration."

Courts taking this view of the matter restrict the application of the last eighteen words in section 122 to matters embraced in that section alone.

### The Minority View.

Courts taking this view regard the word "renunciation" as used in section 122 in the sense of release, and do not limit the application of its last eighteen words to that section alone, but appear to treat them as a sort of statute of frauds and to apply them to all forms of releases, those based on consideration as well as those made without consideration, those arising out of or resulting from things done as contemplated by other sections of the Uniform Negotiable Instruments Law as well as those contemplated by section 122.

We have endeavored to collect the authorities supporting these views, which we shall give, grouping the

decisions cited so as to indicate just what particular act was pleaded by which it was claimed the instrument had been extinguished, also we shall give the year the opinion was delivered so as to enable the student to trace the development of the law, and following that we shall state our position and give the reasons that have induced us to take it.

### Support for Majority View.

### Accord and Satisfaction Cases.

Dickinson v. Vail (1918) 199 Mo. App. 458, 203 S. W. 635; McCoun v. Shipman (1920) 75 Ind. App. 212, 128 N. E. 683; Rector v. Hancock (1920) 127 Va. 101, 102 S. E. 663; Bradley & Metcalf Co. v. McLaughlin (1922) 87 Okl. 34, 208 P. 1032; Bank of Amsterdam v. Welliver (1923) 215 Mo. App. 247, 245 S. W. 130; Lockhart State Bank v. Baker (Tex. Civ. App., 1924) 264 S. W. 566; North Pacific Mortg. Co. v. Krewson (1924) 129 Wash. 239, 224 P. 566, 53 A. L. R. 1416; Vinson v. Wooten (1924) 163 Ark. 170, 259 S. W. 366; Forreston Gin Co. v. Waxahachie Nat. Bank (Tex. Civ. App., 1925) 271 S. W. 290; Ott v. Stone (1927) 225 Mo. App. 132, 29 S. W. (2d) 726; Greiner v. Greiner (1930) 130 Kan. 333, 286 P. 219; Hazelhurst Oil Mill & Fertilizer Co. v. Booze (1931) 160 Miss. 136, 133 So. 120.

### Novation Cases.

Dist. Nat. Bank v. Mordecai (1919) 133 Md. 419, 105 A. 586; Gorin v. Wiley, (1919) 215 Ill. App. 541; Hall v. Wichita State Bank & Trust Co. (Tex. Civ. App., 1923) 254 S. W. 1036; Farmers' State Bank v. Cottingham (Tex. Civ. App., 1924) 261 S. W. 426; Epstein v. Gradowitz (1925) 76 Cal. App. 29, 243 P. 877; Central Mo. T. Co. v. Taylor (Mo. App., 1927) 289 S. W. 658; Nelson v. Hudson (1927) 221 Mo. App. 211, 299 S. W. 1111; First Nat. Bank of Hinton v. Young (1928) 106 W. Va., 134, 145 S. E. 39; Jones v. Wettlin (1928) 39 Wyo. 331, 271 P. 217, 69 A. L. R. 840; Frazer v. Burnley (1929) 229 Ky. 426, 17 S. W. (2d) 212.

### Estoppel.

Citizens' Trust Co. v. Going (1921) 288 Mo. 505, 232 S. W. 996.

### Cancellation.

Henson v. Henson (1925) 151 Tenn. 137, 268 S. W. 378, 37 A. L. R. 1131.

## Text-Books.

Brannon on Negotiable Instruments (5th Ed.) p. 931, sec. 122 et seq.; Bigelow on Bills Notes and Checks (3d Ed.) p. 475, sec. 577 et seq.; Williston on Contracts, secs. 1192, 1829, 1832, and 1833; Russell on Bills, sec. 421; Restatement of the Law, Tentative Draft No. 9, secs. 23A, 24A, 34A.

## Articles in Legal Periodicals.

4 Tulane Law Review, 117; 25 Columbia Law Review, 831; 13 Iowa Law Review, 474; 25 Michigan Law Review, 782; 10 Oregon Law Review, 401; 12 Virginia Law Review, 414; 42 Harvard Law Review, 572.

## Support for Minority View.

## Accord and Satisfaction Cases.

Baldwin v. Daly (1906) 41 Wash. 416, 83 P. 724; Pitt v. Little (1910) 58 Wash. 355, 108 P. 941; Whitcomb v. National Exchange Bank (1914) 123 Md. 612, 91 A. 689.

## Novation Cases.

Ginnett v. Greene (1915) 87 Wash. 40, 151 P. 99; Engle v. Brown (1919) 202 Mo. App. 345, 216 S. W. 541, overruled in Nelson v. Hudson, 221 Mo. App. 211, 299 S. W. 1111; Manly v. Beam (1925) 190 N. C. 659, 130 S. E. 633; Portland Iron Works v. Siemens (1931) 135 Or. 219, 295 P. 463; Tisdel v. Central Sav. B. & T. Co. (1931) 90 Colo. 144, 6 P. (2d) 912.

## Text-Books.

We have found none supporting this view.

## Articles in Legal Periodicals.

Law Series 20, University of Mo. Bulletin, 60 (1920).

Both these views are presented in 8 C. J. p. 615 et seq., sec. 855 et seq.

This court has not heretofore directly adopted either of these views. That the question before us is important is shown by this which is taken from an opinion of the Supreme Court of the United States in Swift v. Tyson, 16 Pet. 1, 18, 10 L. Ed. 865:

"The law respecting negotiable instruments may be truly declared in the languages of Cicero, adopted by Lord Mansfield in Luke v. Lyde, 2 Burr. 883, 887, to be in a great measure, not the

law of a single country only, but of the commercial world. Non erit alia lex Romæ, alia Athenis; alia nunc, alia posthac; sed et apud omnes gentes, et omni tempore una eademque lex obtinebit.''

We can best discover the meaning of the law as it is, since it has been codified, by looking at what it was before the codification was undertaken, for here are some things we have said on that subject:

"Looking to the intention of the law and the purpose of its preparation and enactment, if there is doubt about the meaning of any of its provisions, and that doubt can be solved by a reference to the law merchant as it was theretofore administered, this law should be looked. to, and the act if practicable given such a construction as will make it harmonize with the general principles of commercial law in force before its enactment.''

Wettlaufer v. Baxter et al., 137 Ky. 362, 125 S. W. 741, 743, 26 L. R. A. (N. S.) 804.

"Where its language is consistent with the rule previously recognized, it should be construed as simply declaratory of the law as it was before the adoption of the act.''

Campbell v. Fourth Nat. Bank, 137 Ky. 555, 126 S. W. 114, 116.

These opinions show that this court regards the Negotiable Instruments Law, not as something new or revolutionary, but rather as a codification, a compilation, or a restatement of the law as it was. In view of what we have said in these previous opinions, we shall adopt the majority view, for we find it in harmony with the law as it was before the adoption of the act.

A short time before the adoption of the Bills of Exchange Act in England a valuable textbook appeared, entitled ''Byles on Bills of Exchange.'' This work filled a long-felt want, and soon went through thirteen editions in England and seven in America. In it we find this on page 199:

"It is a general rule of law that a simple contract may, *before breach*, be waived or discharged without a deed and without consideration; but after breach there can be no discharge, except by deed or upon sufficient consideration.

"To this rule it has been repeatedly held that contracts on bills of exchange form an exception,

and that the liability of the acceptor or other party remote or immediate, though complete, may be discharged by an express renunciation of his claim on the part of the holder, without consideration."

See Forster v. Dawber, 6 Exch. 851, and Dobson v. Espie, 26 L. J. Ex. 240, 2 H. & N. 79, s. c.

From this we see that, in regard to a bill of exchange, the word "renunciation" then had a definite meaning in England. It meant the same as the old French expression "Remise volontaire"; it meant a relinquishment without consideration. In adopting the English act, we necessarily took the English construction of it, and besides it is our finding that we have been doing practically the same thing in America.

Renunciation could be made without consideration, whereas "releases" required consideration to support them. In the codification, the word "release" never appears, and there can be but one conclusion; the compilers of the codification in making it and the various Legislatures in adopting it thought it well to safeguard these gratuitous relinquishments, termed "renunciations," by requiring them to be either evidenced by writing or that the instrument affected be delivered up, surrendered, to the party primarily liable thereon, and that the existing law as to "releases" be left as it was.

Before the Negotiable Instruments Law was adopted, there were three principal methods by which a negotiable instrument could be extinguished—one, by act of the debtor alone; second, by act of both the creditor and the debtor; and, third, by act of the creditor alone.

By subsections 1, 2, and 5 of 3720b-119, the powers of the debtor to discharge the instrument are preserved, by subsection 4 of that section the power of both the debtor and the creditor acting in concert to extinguish the instrument, by making a new contract to take its place, is preserved, and by subsection 3 of section 3720b-119 and section 3720b-122 there is preserved the power of the creditor to extinguish the instrument in the one instance by intentional cancellation and in the other by renunciation, with the express provision that, in cases of renunciation, the instrument must be delivered to the principal debtor

(the party primarily liable thereon), or else the renunciation must be in writing.

Without mentioning other ways in which one may extinguish an obligation such as this one or be freed from liability upon it, these two ways are clearly provided for in the Uniform Negotiable Instrument Law:

(a) Under subsection 4 of section 3720b-119, releases on consideration, including novation, accord and satisfaction, covenants not to sue, etc., which would be valid for simple contracts as well. These may be oral.

(b) Under section 3720b-122, releases without consideration, which are not valid for simple contracts. These must be written, or the instrument surrendered.

It is just as clear that these two methods are separate, distinct, and independent of each other as it is that they exist.

Some courts make of section 122 of the Negotiable Instruments Law a sort of statute of frauds, and apply it to every form of release, those based on consideration as well as those without consideration, but the rules we have adopted for the construction of this act in Wettlaufer v. Baxter et al., 137 Ky. 362, 125 S. W. 741, 26 L. R. A. (N. S.) 804, and Campbell v. Fourth Nat. Bank, 137 Ky. 555, 126 S. W. 114, would prevent our taking that position, because it is a departure from the law merchant.

Human nature being what it is, such a requirement, if we had to admit it, would often be disregarded with resulting hardships. We have a statute of frauds relating to land, written in clear and forceful English, and it has been in force for 250 years; yet the reports of every state are full of cases where oral trusts and contracts relating to land have been attempted without any apparent realization of the existence of such a statute. If such an ancient and clearly written statute has not yet entered the consciousness of the ordinary man, then we can well imagine how long it would take to bring home to him the existence of such a rule regarding negotiable instruments, especially when the rule is the result, not of clear legislative enactment, but of judicial interpretation of section 122 of the Negotiable Instrument Law concerning which so many able lawyers and judges have such antagonistic views of its meaning.

The majority rule works no injustice. The debtor who hopes to secure a release by his creditor's promise to make a voluntary relinquishment may be disappointed if the creditor does not put his renunciation in writing, but he suffers no injustice. He expected a gift, and did not get it, that is all.

Where the minority view prevails and this section 122 is treated as a statute of frauds, we can well understand how grave injustice may result.

We cannot believe the Legislature ever intended to set such a trap for the unwary. Against the majority view, the argument is made that it opens the door for the admission of fabricated evidence, but it cannot do that under the rule we adopted in Page v. Neal & Co., 5 Ky. Opin. 419, where we said:

"We do not deny that an obligor in a note may be released by parol, or that a release may be established by parol evidence; but such parol evidence should be clear, satisfactory and directly to the point."

Bronston's position is sustained by our opinions in Akers v. Phillips, 58 S. W. 790, 22 Ky. Law Rep. 813, and Page v. Neal & Co., 5 Ky. Opin. 419; also by our opinion in Morrison v. Gowdy, 199 Ky. 19, 250 S. W. 104.

By section 3720b-195, Ky. Stats., all laws inconsistent with the Negotiable Instrument Law are repealed. That not only repeals such statutes, but also destroys the force of inconsistent judicial opinions, but, after making a careful study of the act, we are unable to find anything in it with which the principles announced in the Akers Case, the Page Case, or the Morrison Case conflict; hence this judgment is affirmed.