Argued January 14; affirmed April 22, 1941

BAGLEY *v.* KERR ET UX.

(112 P. (2d) 459)

Before KELLY, Chief Justice, and RAND, BAILEY and ROSSMAN, Associate Justices.

*John H. Carson*, of Salem, and *C. F. Gillette*, of Monmouth (Carson & Carson, of Salem, on the brief), for appellant.

*Oscar Hayter*, of Dallas, for respondents.

ROSSMAN, J. This is an appeal by the plaintiff from a decree of the circuit court which dismissed his suit. The purpose of the suit was to (a) reinstate a mortgage which is described in the complaint and which was executed and delivered by the defendants to the plaintiff to secure payment of their promissory note in the denomination of $3,600;. (b) secure judgment upon the note; (c) foreclose the mortgage; and (d) secure incidental relief.

The note above mentioned was signed October 1, 1928, and was payable "to the order of O. J. Bagley or Mary Bagley, husband and wife, and unto the survivor thereof." Mary Bagley, who at the time of her marriage to the plaintiff February 20, 1908, was a widow, was the mother of the defendant Walter J. Kerr. The latter is the husband of the other defendant Mabel F. Kerr. Mrs. Bagley died November 13, 1936. Concurrently with the signing of the note the defendants executed the aforementioned mortgage. November 18, 1936, the plaintiff, without having received any consideration, entered in the mortgage records a marginal satisfaction of the mortgage. August 1, 1938, when he

was 78 years of age, the plaintiff married his present wife. Seven and one-half months later, that is, on March 16, 1939, he filed this suit.

The demand for a reinstatement of the mortgage became the sole issue in the circuit court and is the only matter argued upon appeal. As a predicate for that relief, the complaint charged that November 17, 1936, the defendant Walter J. Kerr represented to the plaintiff "that a certain person or persons had threatened to ruin his credit unless the mortgage described in paragraph 3 was satisfied of record and requested the plaintiff herein to enter a satisfaction for the purpose of saving his credit, and representing that unless such satisfaction was entered said defendant would be ruined financially." The complaint alleges that these representations were false, but that the plaintiff, unaware of their falseness, believed them and released the mortgage on November 18, 1936, without having received any consideration. The answer admits virtually all of the above-mentioned averments of the complaint with the exception of those which charge deceit. All averments concerning fraud are denied. From the answer we quote:

"On the 18th day of November, 1936, the plaintiff, with intention to forgive, release, satisfy and discharge as a gift to defendants the indebtedness evidenced by the promissory note and mortgage  *  *  *  and then owing to him by defendants, executed and entered of record a marginal satisfaction of said mortgage * * *. Thereafter, on the said 18th day of November, 1936, the plaintiff informed the defendants that he had executed and entered said marginal satisfaction with the intention of forgiving and discharging the indebtedness evidenced by said note and mortgage by way of a gift thereof to defendants, and defendants accepted said gift."

A copy of the marginal release follows:

"For value received, I hereby acknowledge full and complete satisfaction of this mortgage and discharge the same from record this 18th day of Nov. 1936.

O. J. Bagley.

Attest:

C. S. Graves, County Clerk

By Claire M. Miller, Deputy."

The plaintiff and the defendants lived near each other on farms. According to the plaintiff, the defendant Walter Kerr, to whom we shall refer as Walter, was in the business of "buying sheep and stock."

February 20, 1908, when the plaintiff was a widower, he married Walter's mother, who was a widow. Each at the time had two children. The plaintiff's daughter died unmarried. His relationship with his son Edward was unsatisfactory. He testified that Edward "had been married a time or two * * *. He died, I don't know where he died, I didn't know anything about it, I couldn't hear from him." The early death of his daughter and his displeasure with his son possibly account for the parental attitude which he assumed toward his new stepson.

In 1905 or thereabouts the plaintiff lived upon a farm near Suver in Polk county. Shortly he became a rural mail carrier and continued in that occupation until 1928 when he retired on a pension of $72.50 per month. He was then 67 years of age. About a year after his retirement he suffered a paralytic stroke which still affected his movements at the time of the trial.

In 1905 the plaintiff became acquainted with Walter. Three years later he married Walter's mother. The

marriage was a happy one. A strong bond of friendship, if not of affection, developed between the plaintiff and Walter. Both said that it approximated the relationship which exists between father and son. May 21, 1919, Walter and his co-defendant were married. The plaintiff became very fond of Walter's wife and treated her like a daughter. The two families lived upon tracts of land a quarter of a mile or so from one another and exchanged many visits. Hardly a day passed but that Walter or his wife called upon the Bagleys and the latter at times visited the young folks. The plaintiff, in detailing this happy relationship, said that "no trouble of any kind" had ever developed between the two families. In the last four or five years of Mrs. Bagley's life she became afflicted with a heart ailment. Mrs. Kerr testified that as a result of this ailment Mrs. Bagley "would be up and down * * * but there were times which would run into weeks when she couldn't be up." Mrs. Kerr, who called the plaintiff "Grandpa", testified further: "Well, they would call me and maybe I would be doing the dishes or different things, and Grandpa would come and say Mrs. Bagley wanted me to come up. I always went. I don't think there was ever a time when I didn't go. Maybe I would give her a bath, maybe there was something she wanted me to fix to eat, maybe I took her something to eat. Sometimes I took the sweeper up and swept the front room. Sometimes I made her bed, * * * Several times I did the washing * * *." Her testimony continued in like vein. Carl J. DeArmond, who had known all of the parties over an extended period of time, said: "They seemed to be very congenial, they always got along very well. I know that Mrs. Kerr did lots of things for Mr. and Mrs. Bagley, and I don't

think Mr. Bagley will deny it. I know they done as much for him as any person could. I know I have made the remark more than once to my wife, 'I wouldn't do what Mrs. Kerr has done for anybody for all they had.' I thought they done just as much as a person could do, one for another." Upon cross-examination, he added, "Well, I don't think it was too much maybe, but it was wonderful to be able to do it, I can say that, not many people do it, * * *." Mrs. Harriet Douglas, another neighbor, who had long been acquainted with all of the parties, testified concerning Mrs. Kerr: "When Mrs. Bagley was sick she done anything any one would do for a sick person when they needed help, I know, I went there, and Mrs. Bagley would tell me Mabel had brought her this or that, bake and cook and bring things to eat, and she would say Mabel done this or that helping out about the house." Without referring to other witnesses, we state that more than one of them mentioned the very congenial relationship which existed between the two families. Likewise, more than one mentioned the kindly, even generous, attitude displayed by the defendants, especially by Mrs. Kerr, toward the Bagleys. After the plaintiff had suffered a paralytic stroke and was confined in a Corvallis hospital one or other of the defendants drove Mrs. Bagley to the hospital many times to visit her husband, and later Mrs. Kerr drove the plaintiff to a Salem physician where he received treatments.

Upon the death of Mrs. Bagley in November, 1936, the defendants invited the plaintiff to make his home with them. He said, "They insisted on me coming down there to live, but I had always been used to living at home all my life"; he declined the invitation. A friend of the two families, referring to the incident, said: "He

told me one time about them offering him a home and he seemed pleased about it.'' The plaintiff stayed with the defendants for a few days following his wife's death and then returned to his own home. He thought the period was three days, but the defendants said that it was two weeks or thereabouts. The affectionate relationship which had existed during Mrs. Bagley's life continued until a few months before this suit was filed. After the plaintiff had returned to his home the defendants visited him regularly and on many occasions he had his dinner at their home. Mrs. Kerr on her periodical visits to the city never failed to stop at his home and invite him to ride with her. He generally accepted the invitation. On many occasions Mrs. Kerr went to the plaintiff's home and gave it the attention of which only a good housewife is capable. During periods of illness Walter sometimes helped his stepfather. In one period, when the latter's father met with ill health, Walter helped him.

None of the testimony above reviewed which bears upon the cordial relationship that existed between the parties and which indicates that the defendants continuously performed for the Bagleys acts of goodness, was in any way questioned by the plaintiff; to the contrary, he confirmed most of it. There is nothing in the record which indicates that this consideration, which was manifested over a period of more than a score of years, was feigned or prompted by a hope that it would lure a reward.

The plaintiff swore that early in the morning of November 18, which was five days after Mrs. Bagley's death, Walter came to his home and ''made certain remarks that he was afraid certain parties would injure his credit if I didn't release the mortgage.'' He added

that he believed Walter and satisfied the mortgage. Apart from swearing that before he released the mortgage he took that instrument and the note from the bank where they reposed and that the defendants drove him in their car to Dallas where he signed the release, the above is the only explanation which the plaintiff made upon direct examination concerning the release. His above-quoted words constitute the full statement which he made upon direct examination concerning the alleged false representation. Upon cross-examination, he described in the following words the alleged false representation: "Why, he was borrowing money at the bank and represented that he was afraid if it was reported around that Ed Steele could injure his credit at the bank, that is the way I understood it, and I took him for an honest man and I released the mortgage." He said that before acting upon the alleged false representation he made no inquiries of either Ed Steele or any official of the bank. Ed Steele's wife was the sister of Walter.

Although the plaintiff claims that he entered the satisfaction in compliance with Walter's urgent request that he do so, yet he swore that after he had made the entry he never told Walter that he had done so. His own words were, "I never told them."

The mortgage under consideration was signed by the defendants in 1928 and was in default in 1936. Besides owing to the plaintiff the amount of the mortgage debt, Walter owed him other sums resulting from occasional borrowings. The latter aggregated about $2,000, but a part of these borrowings had been repaid. The plaintiff had never asked for the repayment of these sums. He said, "I supposed when he would get the money he would pay me up." The note and mortgage

were kept in a bank in Monmouth and it was there that Walter had made interest payments. The latter, however, had not met the requirements of the note. As we have indicated the plaintiff, before entering the marginal satisfaction, went to the bank and secured a return of the note and mortgage. After having made the marginal release he never returned the instruments to the bank.

During the course of the trip to Dallas the plaintiff asked Walter to drive to Independence and stop in front of the office of B. W. Swope, an attorney. When that place was reached the plaintiff had Mr. Swope prepare a will for him, and after its preparation signed it. The will, after making bequests totaling $502, which we shall shortly detail, gave the residue of the estate to Walter. It nominated him as executor.

The plaintiff testified that when he made the marginal satisfaction and signed the aforementioned will, "I didn't expect to be alive no time, after I had a stroke and after Mrs. Bagley passed away." It will be recalled that she died five days before the transactions just mentioned occurred. Apparently the disposition of his estate had bothered the plaintiff. For instance, he swore that he told Mr. Swope, "I had to leave it to somebody, I didn't want them other grandchildren to get anything." The grandchildren to whom he referred were two of the three children of his deceased son Edward. To those two his will gave $1.00 each. He designated them thus in his will: "The other two sons of said Edward L. Bagley, whose names I can not at this time remember." He had never seen them, and said, "The attorney set out to find them, that is all I know." To the third of Edward's children he gave $200. Concerning him he said, as a witness, "I never saw the boy

for the last twenty years." The other bequest in his will was the sum of $300 to Margaret Steele, who was Ed Steele's wife and Walter's sister. About the time of the entry of the satisfaction and the signing of the will, the plaintiff converted a policy of fraternal insurance into a paid-up policy of the denomination of $360 and in it named Walter as the beneficiary.

Walter denied that he had ever made the representations described by the plaintiff. He testified that he never asked that the mortgage be released. According to him, he was experiencing no difficulty over his credit. He likewise swore that he and Ed Steele were having no trouble and that there was no reason why Steele should have threatened to ruin his credit. Steele gave similar testimony. Mrs. Kerr corroborated her husband. An official of the bank where Walter had his account swore that Walter's account was satisfactory and that he knew of no threats against his credit. He also swore that the bank officials knew of the note and mortgage. The latter had been recorded in the mortgage records.

Mrs. Kerr, in contradiction of the plaintiff's version of the matter, testified that the plaintiff was still staying in their home when the trip to Dallas was made, and that he remained there for a week or so afterward. According to her, the plaintiff asked her, on November 18, 1936, to induce Walter to drive them to Dallas, saying that he wanted to "fix up his business." Both of the defendants testified that they were unaware of the plaintiff's purpose in going to Dallas until he told them about it on their return trip. Walter swore that as they were driving home, "Well, he just told me he had fixed everything up, made his will out and released the mortgage and he said that he thought he owed it to us and

he didn't know how long he was going to live and he thought we was deserving of it, more than anybody.'' Mrs. Kerr testified that on the return trip the plaintiff ''related to us how he had made out the will, who he had left the money to, and he said, 'I want to cause you as little trouble as possible and have made Walter administrator without bonds.' * * * He said he had released the mortgage, he said no one had did as much for him as we had and he said the money didn't worry him, he had plenty, because he had this—I won't say $75.00, whatever his pension was. He remarked, 'If I get sick you folks won't have to take care of me, take me to the hospital and that will take care of me.' He seemed at that time to have every consideration of us.''

As we have already said, the plaintiff swore that he never told the defendants that he had satisfied the mortgage records. He also testified that he never told them about having made a new will. Unless we misinterpret his contentions, he claims that he never told any one about either act.

August 1, 1938, the plaintiff married Mrs. Susie Crockett, who had been serving him as housekeeper. Both of the defendants testified that shortly after that marriage the plaintiff's attitude toward them changed. He no longer accepted Mrs. Kerr's invitations to ride with her when she went to the city; and somehow the defendants felt that they were no longer welcome at his home. Somehow by Christmas of 1938 things had become so tense that words passed between the plaintiff and Walter over such an insignificant item as a string of Christmas tree lights. Walter apparently thought that they belonged to him as a keepsake from his mother's possessions. When he returned them, at the

request of the plaintiff, the latter said something about the note and mortgage. According to the defendants, that was the first time they heard that the plaintiff was dissatisfied with the cancelation of the mortgage record. After his remarriage the plaintiff revoked the will which we have already described and signed a new one. He likewise substituted another beneficiary for Walter in the aforementioned paid-up fraternal insurance policy. Shortly he demanded payment of the note, and on March 16, 1939, filed the suit with which we are now concerned.

■ We agree with the trial judge that the above-reviewed evidence does not indicate that the defendants, or either of them, employed false representations incidental to the mortgage satisfaction. We are satisfied that no false representations were made. It appears to us that the plaintiff released the mortgage of his own volition. He was prompted so to do, in our opinion, by a sense of gratitude for the many acts of kindness which had been performed for him, and especially for his wife, who had died only five days before the marginal entry was made. At the time he visited the courthouse his thoughts had turned to the world beyond. He believed that he would soon follow his wife. He was then 77 years of age, in low spirits and in ill health. He had concluded that the time had come for him to make preparations for the eventual distribution of his estate. He makes no claim that the defendants exerted any influence whatever to induce him to write the will which he signed on the same day he visited the courthouse; in fact, he admits that they did not even know he planned to write a will. Yet that will made Walter its residuary devisee and nominated him as executor— testimonials to the high esteem in which the plaintiff

held his stepson. The conclusion is inescapable that the same promptings that induced him to write the will influenced the plaintiff to cancel the mortgage. In short, this elderly man's only concern on the day when the satisfaction was entered was to make preparation for the distribution of his bounty. To deal with others justly whose beneficence he had enjoyed was the thought which induced the entry of the satisfaction. Seemingly, he believed that by entering the marginal satisfaction he would not only improve his stepson's financial position but also save trouble concerning the mortgage debt after his death. That he should not have entered the satisfaction did not occur to him until months later when he viewed the transaction in retrospect; but by that time a new wife was in his home and he was thinking of life, not of death. His point of view had completely changed. Somehow he had become satisfied that he owed it to his new helpmate to recapture this mortgage debt. But the means which he adopted are, in our opinion, unavailable to him. We dismiss the charges of false representation as lacking in support.

■ We shall now determine whether the marginal entry operates as a satisfaction of the debt.

The plaintiff contends that since he kept the note and mortgage and handed the defendants nothing at the time of the marginal entry, no gift was made. He urges that a delivery is necessary to complete a gift and that the above-reviewed facts show no delivery of any kind.

Before proceeding further it may be well to recall that on November 18, 1936, the following incidents occurred in the following order: (1) The plaintiff called at the bank where the note and mortgage were kept and obtained their return; (2) he went to the court-

house and made the marginal entry; (3) he told the defendants what he had done for them and said that they were deserving of it; (4) he never returned the two instruments to the bank where the interest payments had been made; and (5) he never thereafter asked for any payment upon the obligations until shortly prior to the institution of this suit.

Section 68-106, O. C. L. A., says:

"Any mortgage that has been or may hereafter be recorded may be discharged by an entry in the margin of the record thereof, signed by the mortgagee or his personal representative or assignee, acknowledging the satisfaction of the mortgage, in the presence of the county clerk or his deputy, who shall subscribe the same as a witness; and such entry shall have the same effect as a deed of release duly acknowledged and recorded."

From § 1262, Jones on Mortgages (8th Ed.), we now quote:

"A deed of release in the ordinary form, as well as an entry of satisfaction upon the margin as usually made, contains an express acknowledgment of the payment of the debt; and in such case this would be prima facie evidence of the discharge of the debt, and perhaps conclusive evidence of it, unless fraud or mistake be shown in making such entry or release. But this is otherwise if the release contains no such recital; although, if the purpose be to release the security without releasing the debt, this should be distinctly stated."

From *Larson v. Ames Church of Christ*, 213 Iowa 930, 239 N. W. 921, we quote:

"The law is well settled that a release of a mortgage, as in this case, is, in itself, prima facie evidence of payment, and the release imports extinguishment of the debt as well as the mortgage, and the burden of showing that it is not so intended is on the creditor."

In *Fleming v. Parry*, 24 Pa. St. 47, the payee entered upon the margin of the mortgage record the following: "* * * do hereby acknowledge to have received satisfaction in full of this mortgage." Concerning those words the decision said:

"Prima facie they would indeed import extinguishment of the debt as well as the mortgage, and the burden of showing they were not so intended was on the creditor."

In *Townsley v. Townsley*, 167 Iowa 226, 149 N. W. 262, the creditor executed a release of the mortgage which recited that the latter "is redeemed, paid off, satisfied and discharged." The court held that the note was discharged.

No purpose to release the security and retain the debt is indicated by the words of the marginal entry. Nothing that was said either before or after the making of that entry, and which is capable of belief, indicated a purpose to reserve the debt. To the contrary, the feeling of satisfaction which the plaintiff manifested when, on the way home, he told the defendants that he had released the mortgage, can be attributed to only one thing—he had canceled the debt. Had he merely released the lien of the mortgage, his talk would have been of a very different nature.

We conclude that the marginal entry not only released the security but also discharged the debt, if in fact the entry became effective. The plaintiff claims that what he did on November 18 lacked completeness, that he made no delivery of anything. We shall now consider that phase of the issue.

Although much is said in the briefs concerning delivery, actual, constructive and symbolical, it will be observed that the plaintiff's purpose was not to make a gift of the note and mortgage, but to renounce the

rights which they conferred upon him and which he possessed. It is a matter of common observation that a creditor who makes a gratuitous release of a debt does not believe that he is transferring something to his debtor. It is his purpose to discharge, abandon or give up the debt, and he understands that the release which he signs will so operate. He does not deem it a gift of the obligation. Of course, the plaintiff could have endorsed the note and executed an assignment of the mortgage, and, of course, he could then have given all three instruments to the defendants; but the legal effect of such a course of conduct would not have been the consummation of a gift but the discharge of the note and mortgage. See § 69-801, O. C. L. A., subd. 5 (§ 119, subd. 5, Uniform Negotiable Instruments Act). So, we repeat that the plaintiff's purpose was not to make a gift, except of a forgiveness of the debt, if such an intangible can be deemed the subject matter of a gift. It is our opinion that his purpose was to cancel the rights which he possessed; that is, the right to exact payment by the defendants of $3,600. The legal principles which govern the problem before us are not those which delineate the elements requisite to a valid gift, but are those which prescribe the manner in which a chose in action may be extinguished, canceled or renounced.

■ Section 69-804, O. C. L. A., being § 122 of the Uniform Negotiable Instruments Act, says:

"The holder may expressly renounce his right against any party to the instrument before, at or after its maturity. An absolute and unconditional renunciation of his rights against the principal debtor, made at or after the maturity of the instrument, discharges the instrument; but a renunciation does not affect the rights of a holder in due course without notice. A re-

nunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon.''

It will be recalled that the release which the plaintiff signed said: ''I hereby acknowledge full and complete satisfaction of this mortgage and discharge the same * * *.'' In 25 Columbia Law Rev. 831, it is said:

''If the intent is clear, there should be no difficulty in construing words of payment as expressive of the idea 'I renounce.' ''

By reverting to its language, it will be seen that § 122 recognizes two methods whereby a holder may effect a renunciation of his rights: (1) By placing the renunciation in writing; (2) by delivering the instrument to the person primarily liable upon it. The recognition of the alternative is an indication that a delivery is not necessary if a writing is employed.

■ Comparing the facts before us with the exactions of § 122, we see that the plaintiff was the holder of the promissory note with which we are concerned. Thus, the first requirement of the section is met.

The language of the marginal entry which the plaintiff made was in fact ''an absolute and unconditional renunciation of his rights against the principal debtor.'' Thus, the second requisite is satisfied. In this case there is no ''holder in due course without notice.'' Hence, this occasional exaction of the statute does not concern us. The renunciation was in writing; accordingly, one of the two alternatives found in the last sentence of the section was embraced. Therefore, every exaction of § 122 is satisfied.

■ Section 122 does not require the receipt of a consideration. Sections 119 and 120 (§§ 69-801 and 69-802, O. C. L. A.) are the parts of the act which provide for

discharge by payment and it is worthy of note that those two sections employ the word "discharge" whereas § 122 uses the word "renunciation." *McGlynn v. Granstrom,* 169 Minn. 164, 210 N. W. 892, a decision which shows that its author gave careful attention to its preparation, comments upon the three sections of the Negotiable Instruments Act just cited, and says:

"Section 122 came to us from the British Bills of Exchange Act. According to Judge Russell of the Supreme Court of Nova Scotia (Russell on Bills (2d Ed.) 421), it 'embodies the law as laid down' in Foster v. Dawber, 6 Ex. 839, 851. There it was held that both bills and notes could be discharged by 'express waiver' without consideration. Parke, B., explained that the rule had come into English law from the law merchant. He referred to it as 'that rule * * * prevailing in foreign countries, viz. that there may be a release and discharge from a debt by express words, although unaccompanied by satisfaction or by any solemn instrument. Such appears to be the law of France, and probably it was for the reason above stated that it has been adopted here.' Expounding the statute, Judge Russell says in his text: 'The acceptor may be discharged from his liability on the bill by a renunciation. * * * Before the passing of the act this renunciation was complete and effective without any writing and without the surrender of the instrument, but it was thought well to require some formality. It still remains law that no consideration is necessary for such a discharge, but in order to be effective a renunciation must be in writing unless the bill is delivered up to the acceptor.' The same concept of renunciation, express waiver without consideration, is expressed by another English authority, Byles on Bills (18th Ed.) 233. To the same effect are the annotations by Mr. Smythe of the Canadian Bills of Exchange Act of 1890, p. 111. Sir M. D. Chalmers, draftsman of the British Bills of Exchange Acts of 1882 and 1906, says: 'The words requiring the renunciation in writing were added in committee. They alter the English law, but bring it into accordance with the Scot-

tish law. At common law a contract cannot be discharged by accord without satisfaction. The special rule as to bills and notes partially reproduced in this section seems to have been consciously imported into the law merchant from French law (citing Foster v. Dawber, supra). This mode of discharge is known in France as "remise volontaire," and is recognized in countries where the civil law is followed.' * * * So we are constrained to hold that the renunciation, which under section 122 must be in writing, is one accomplished by the unilateral act of the holder. Ordinarily, if not always, it will be without consideration."

A review of that decision in 25 Mich. Law Rev. 782, approves the conclusion and the court's interpretation of § 122. The review says:

"By expressly giving effect to a discharge without consideration § 122 creates a method of discharge which was unknown to the American common law. * * * After tracing the source of § 122 back through the English B. E. A., to the case of Foster v. Dawber, it is difficult to escape the conclusion that that section was intended to embody a particular method of discharge, distinct from any of those enumerated in § 119."

We now quote from 12 Cincinnati Law Rev. 430:

"The better interpretation of § 122 is that it refers to a forgiveness, or imports a gratuitous abandonment of a right and that it applies only to a renunciation by a unilateral act of the holder when the instrument is not delivered up to the obligor."

The following is taken from § 1833 Williston on Contracts, Rev. Ed.:

"The draftsman of the American Negotiable Instruments Law, however, copied the provisions of the English act, and, as this law has been enacted universally throughout the United States, a written renunciation or discharge of a bill or note or of the liability of any party thereon is now good without consideration, subject to the rights of a holder in due course, * * *."

See also *Johnston & Larimer Dry Goods Co. v. Helf,* 178 Okl. 527, 63 P. (2d) 681, 108 A. L. R. 650, for an extensive analysis of the authorities.

We are satisfied that the plaintiff's entry in the mortgage records adjacent to the place where the mortgage in question was recorded constituted a renunciation of the plaintiff's rights under the note and mortgage. That, we believe, was his purpose in making the entry—he wanted to forgive the debt; and, as already indicated, the plaintiff, in effecting his purpose, followed the formula set forth in § 122 of the Uniform Negotiable Instruments Act. The result which he accomplished was an extinguishment of the debt. Since § 122 is free from ambiguity and states the legal effect which attaches to conduct such as the plaintiff pursued, it seems unnecessary to cite decisions in support of the conclusion just announced. However, we believe that the following are in point: *Croxton v. Barrow,* 57 Ga. App. 1, 194 S. E. 24 (for an informative review of that decision see 12 Cincinnati Law Rev. 430); *Kuen v. Upmier,* 98 Iowa 393, 67 N. W. 374; *Pyle v. East,* 173 Iowa 165, 155 N. W. 283, 3 A. L. R. 885; *Parker v. Mott,* 181 N. C. 435, 107 S. E. 500, 25 A. L. R. 637; and *Millett v. Temple,* 280 Mass. 543, 182 N. E. 921, 84 A. L. R. 378 (annotated on subject of gifts). It is true that none of the decisions just cited were based upon the provisions of the Uniform Negotiable Instruments Act. Each employed the principles of law governing the making of a gift as expounded in Mechem; The Requirement of Delivery in Gifts of Chattels and of Choses in Action Evidenced by Commercial Instruments, 21 Ill. Law Rev. 341; Relaxation of the Requirement of Delivery in Gifts of Personal Property, 6 Fordham Law Rev. 106; and Gifts Inter Vivos of Choses in

Action, 27 Law Quar. Rev. 326. The decisions just cited would deem the plaintiff's marginal entry a substantial delivery of the forgiveness of the debt or as a substantial redelivery of the note and mortgage. Further, those authorities would hold that the plaintiff's donative intent was clear and that he had completed his gift of a forgiveness of the debt.

*Dickinson v. Lucas,* 101 L. T. N. S. 27, employed the provisions of the English Bills of Exchange Act, which is similar to § 122 of our Uniform Negotiable Instruments Act, and reached a conclusion similar to that expressed above. American decisions which sustained renunciations of promissory notes under § 122 are *Gannon v. Bronston,* 246 Ky. 612, 55 S. W. (2d) 358, 86 A. L. R. 324; *Jones v. Wettlin,* 39 Wyo. 331, 271 P. 217, 69 A. L. R. 840; and *Northern Drug Co. v. Abbett,* 205 Minn. 65, 284 N. W. 881. 121 A. L. R. 1349. In the decision just cited the court said:

"Renunciation may be with or without consideration. Where the holder does not receive a consideration the renunciation amounts to a gratuitous release."

The three volumes of Annotated Law Reports just cited at the pages indicated are followed with extensive annotations dealing with the subject under investigation. A digest and classification of other decisions may be found in Brannan's Negotiable Instruments Law (6th Ed.), § 122, and U. L. A., Negotiable Instruments, § 122. For a discussion see 8 Am. Jur., Bills and Notes, p. 437, § 782, and 10 C. J. S., Bills and Notes, p. 1026, § 474.

It follows from the foregoing that the decree of the circuit court is affirmed. Costs and disbursements will be withheld.