173 F.2d 689 (1949)
In re KELLETT AIRCRAFT CORPORATION.
No. 9728.
United States Court of Appeals Third Circuit.
Argued November 1, 1948.
Decided February 9, 1949.
Rehearing Denied March 28, 1949.
Joseph J. Brown, of Philadelphia, Pa., for appellant.
*690 Charles A. Wolfe, of Philadelphia, Pa., for appellee.
Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.
McLAUGHLIN, Circuit Judge.
This appeal is from the dismissal of a proof of claim and of a petition for reclamation filed in the proceeding for the reorganization of Kellett Aircraft Corporation under Chapter X of the Bankruptcy Act, 11 U.S.C.A. A further amendment of the petition for reclamation, allowing appellant to present its claim to recover the sum paid by it for certain tools fabricated for it by Kellett and reserving the right to the trustees to offer defenses or setoffs thereto, was suggested by the Master and allowed by the court.
On April 2, 1946 Coldaire, an Illinois corporation licensed to do business in Pennsylvania, and Bob White Organization, a partnership, entered into a contract with Kellett whereby the latter agreed to build and sell to Coldaire 12,500 refrigeration cabinets of various models in accordance with designs and specifications to be furnished by Coldaire. Kellett was to manufacture the necessary tools for the construction of the cabinets at the cost of Coldaire. Shortly thereafter Kellett moved its manufacturing operations from its plant at Primos, Pennsylvania, to its new factory at North Wales, Pennsylvania. Coldaire made various changes in the cabinets from time to time because of operation imperfections which arose and in connection with these there were two amendments to the contract.
Whatever may have been Kellett's financial situation prior to August 1946, it is evident that during that month it was in difficulty. In appellant's proof of claim it states that on August 23rd Kellett terminated without notice all manufacturing operations under its contract with Coldaire and all its other civilian contracts. The Master finds that Kellett continued production under those contracts, including Coldaire's, until September 9, 1946 when it terminated all of its commercial activities except its contract production of helicopters for the United States Army Air Forces. Coldaire asserts that at the time it had unfilled orders for cabinets and a further large potential market for them. After that and prior to October 9, 1946 there were negotiations between the parties for a new contract, and this was entered into on October 9, 1946.
That October contract preliminary stated it was being executed because Kellett was "unable or unwilling" to complete its obligations to Coldaire under the April 2 agreement by reason of which Coldaire had suffered substantial losses, estimated by it to exceed $450,000. The next succeeding clause read: "Whereas said parties desire to compromise and release said claim for damages and release all parties from any further obligations under said contract * * *".
The body of the contract provided that the materials, parts and work in process at Kellett listed in Exhibit "A", were sold to Coldaire for $8,000. Coldaire was also given the right to purchase at named prices the parts and raw materials listed in Exhibit "B". Paragraph five read that "Coldaire will assume obligations for all open purchase commitments of Kellett as set forth in Exhibit `C'." Paragraph eight said that if Wilson Cabinet Company or an affiliated company did not rent that part of Kellett's North Wales plant devoted to production for Coldaire and including machinery and equipment, Coldaire would have the right to lease the particular premises on a basis to be determined by the parties. Exhibits "A", "B" and "C" were made part of the contract. Paragraph eleven read: "Except for the rights and obligations created hereby all contracts, claims, demands, rights, duties, obligations and liabilities existing at any time up to the time of the execution hereof between Kellett and Coldaire and/or Kellett and White are hereby mutually satisfied, discharged and released."
The total cost to Kellett of the materials, parts and work in process listed in Exhibits "A" and "B" was approximately $280,000, and the Master found this sum to be their approximate manufacturing value as of the contract date. This amount was *691 $152,000 in excess of the total purchase price of these items to be paid by Coldaire under the agreement.
On October 14, 1946 Kellett entered into a contract with Wilson Company whereby the latter was to lease the premises, machinery and equipment which are the subject of paragraph eight of the October Coldaire contract above referred to. The Wilson agreement was delivered to Kellett on October 18, 1946, the date the present trustees were appointed. It provided, among other things, that it was subject to the approval of the War Assets Administration.
Between October 18, 1946 and the end of that month the trustees permitted some Coldaire production but, pending their investigation, refused to allow the removal of any cabinets. On October 31, 1946 the trustees notified Coldaire and Wilson that the contracts of October 9th and 14th were invalid. The Wilson agreement was thereafter treated by all the parties as a nullity. On December 4, 1946 the District Court on petition of the trustees granted them permission to reject the October 9th contract without prejudice to any existing rights under the April 2nd agreement. Both the Master and the District Judge found that the April contract was voided by the agreement of October 9, 1946.
As we see it, the clear intent of paragraph eleven of the October agreement was to substitute that agreement for the April contract. The language is plain and unless it is contrary to the governing law, it must control. There is not the slightest intimation that the release depends on performance of the October obligation. It presently releases the parties from all contracts and liabilities existing between them down to the October agreement.
Such action was in accord with the entire situation as it prevailed at the time. Coldaire was dealing with a virtual bankrupt who was finished as a Coldaire cabinet manufacturer. Appellant's brief implies that had conditions remained as they were Coldaire might well have been forced to resort to bankruptcy proceedings against Kellett in an effort to mitigate its losses under the April contract. True, Coldaire had a cause of action under that contract for what it was worth, but to exchange that most unsatisfactory status for an agreement by which Kellett was firmly bound to turn over to Coldaire all uncompleted Coldaire production on extremely favorable terms could have had a strong appeal to Coldaire under the circumstances. In addition, provision was made whereby Wilson or Coldaire itself took over the Coldaire production part of Kellett's plant with its machinery and equipment. Whether Coldaire would have the opportunity to function under the agreement depended on whether Kellett would be able to continue formally as a going business. This can be assumed to have been doubtful, but it could have been thought to have been worth trying since the alternative might have been even worse. In this situation consideration for the substitution of contracts is strongly indicated.
It is not disputed that the October 9th contract was executed in Pennsylvania. The law of that state supports the proposition that where as here there is an evident intent to substitute one agreement for another and consideration appears, such contract is binding.
The controlling case is Meaker Galvanizing Co. v. Charles E. McInnes & Co., 1922, 272 Pa. 561, 116 A. 400, which involved a business contract of sale. The purchaser's consignee being unable to establish credits, the purchaser requested the vendor to cancel. The vendor refused, alleging labor and material expended to the amount of $3,500. After negotiation it was agreed that a compromise payment of $2,000 be made by the purchaser to the vendor. Later the vendor, despite this, sued on the larger claim. In denying the larger claim, the court said, 272 Pa. at page 565, 116 A. at page 401: "Admittedly, the plaintiff is entitled to damages arising from the breach of the contract to purchase, but it is insisted that the agreement to pay $2,000 in settlement of the unliquidated claim constituted merely an accord, which was revocable until actual compliance with its terms. The correctness of this position depends upon the construction of the correspondence, which indicates the understanding. There is no conflict in the facts, and the determination of the intention of the parties, resting *692 solely on the interpretation to be placed on their letters, was properly treated as a question of law. Moers v. Moers, 229 N.Y. 294, 128 N.E. 202, 14 A.L.R. 225. It is undoubtedly true that an agreement to accept a smaller sum in satisfaction of a claim for a larger is an accord, revocable until satisfied by actual and complete performance. There is a distinction to be drawn, however, between an agreement to accept a promise in satisfaction and an understanding requiring performance of the promise. Hosler v. Hursh, 151 Pa. 415, 25 A. 52. When the intention is to substitute the former, the contract made is binding, Laughead v. H. C. Frick Coke Co., 209 Pa. 368, 58 A. 685, 103 Am.St.Rep. 1014; In re Hartzog's Estate, 270 Pa. 172, 113 A. 193; 1 C.J. 530, 567, provided, of course, a consideration appears, In re Dillon's Estate, 269 Pa. 234, 111 A. 919; a requirement sufficiently met when, as here, there is an adjustment of unliquidated demands. Scranton Gas & Water Co. v. Weston, 57 Pa.Super. 355; 1 C. J. 551. The present Chief Justice, in Shoemaker v. Fegley, 14 Pa.Dist.R. 850, 856, after commenting upon the pertinent authorities, thus concisely states the rule: `The performance generally is the carrying out of the agreement of accord; but it may be expressly agreed, or the circumstances may clearly show, that the promise or agreement of accord itself is to be taken in satisfaction of the original demand, and when that is the case the promise or undertaking, if supported by a sufficient consideration, is to be accepted as equivalent to performance or execution.' Schwartzfager v. Railway (Pittsburgh, H. B. & N. C.R. Co.], 238 Pa. 158, 85 A. 1115, Ann. Cas.1914C, 149; and Foye v. [Lilley] Coal & Coke Co., 251 Pa. 409, 96 A. 987, cases relied upon by appellant, are not in conflict with the view as thus expressed."
Appellant because of the opening phrase in the above quotation suggests that the Meaker case merely stands for the principle that a party might have two contract rights regarding the same subject matter and sue on either, but the court's succeeding language leaves no doubt that the opinion is sound Pennsylvania authority for upholding the judgment of the District Court. Relying chiefly on the Schwartzfager decision referred to in the above quotation from the Meaker opinion, appellant says that the latter is not the law of Pennsylvania. It is noted that the Pennsylvania Supreme Court in Meaker held that the Schwartzfager case did not conflict with the doctrine outlined and the Schwartzfager facts show why that is so.
There, a release was given to a carrier by a person injured through its negligence. The release promised certain things would be done by the railroad in addition to an initial cash payment; among those things was to be the payment of the wages lost by the injured party. The wages at the time of the execution of the release were undetermined since the injured party was still unable to work. But no wages were paid, even when due. The injured party sued on the original claim. The railroad defended on the release. The court held the release, because only partly executed, did not bar the action. After reviewing earlier Pennsylvania decisions, it held 238 Pa. at page 165, 85 A. at page 1117, Ann. Cas.1914C, 149 that: "* * * the agreement in the present case cannot be fairly construed to be an acceptance of the defendant's promise to pay wages in lieu of the then existing obligation of the company to make good the damages caused by its negligence; but it must, we think, be regarded as contemplating the payment of wages for the specified time  that is, until plaintiff should recover his ability to work at his trade. The agreement, thus construed, was executory." We have no quarrel with this language as applied to its own facts for, admittedly, the tortfeasor had only performed a minor part of the consideration which it had promised in exchange for the injured person's release. Lucas v. Gibson, 341 Pa. 427, 19 A.2d 395, follows Schwartzfager and is on identical facts. In the matter before us we are confronted by a far different picture where both parties were obviously struggling to avert the impending catastrophe and where Coldaire's acceptance of Kellett's promise to perform the hard October agreement in lieu of the April contract, makes cold business sense. It was Hobson's choice, the only alternative being to put Kellett into bankruptcy.
*693 The Pennsylvania view as exemplified in the Meaker decision is in accord with that of neighboring states. Moers v. Moers, 229 N.Y. 294, 128 N.E. 202, 14 A.L.R. 225; Pignone v. Brooks, 120 N.J.L. 258, 260, 199 A. 372. The most recent independent federal statement of the principle we have seen is found in Wyatt v. New York, O. & W. R. Co., 2 Cir., 45 F.2d 705, 708, certiorari denied, New York, O. & W. R. Co. v. Wyatt, 283 U.S. 829, 51 S.Ct. 353, 75 L. Ed. 1442, where the court said: "Ordinarily an executory contract constituting an accord is not a bar to an action upon the original claim; `satisfaction,' that is, full performance of the contract of accord, is also necessary. If the parties so intend, the contract of accord may itself be taken as a satisfaction and discharge of the original claim; but the intention must be clear, and the presumption is otherwise."[1]
Appellant also argues that the October contract was ineffective because the lease between Kellett and Coldaire contemplated by paragraph eight was not agreed upon and because of its assertion that the items listed in Exhibit "C" referred to in paragraph five were never assented to by Coldaire.
As to the lease, appellant cites cases and quotes Williston on Contracts, Rev.Ed., Section 45 VI, for the settled principle that, "If an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement." But the same section goes on to say, "It should be observed, however, that though such a promise is invalid, it will not necessarily invalidate an entire agreement of which it forms a part. Whether it will have this effect depends upon its relative importance and its severability from the remainder of the contract of which it forms a part." And Section 48 states that it is "evident that the question must be one of degree." Pennsylvania makes the question specifically one of intent. In Easton v. Jones, 193 Pa. 147, at page 149, 44 A. 264, at page 265, the court said: "Whether the contract was technically entire or severable is of comparatively little importance, for no classification of the contract can be permitted to defeat the intent of the parties. The distinction itself between entire and severable contracts is based on the difference in intent."
The lower Court in confirming the Master's finding that paragraph eight was severable held that paragraph eight was unessential to the performance of the balance of the contract and intended by the parties to be entirely separate therefrom. There is ample evidence to justify that factual finding. As the Master says, "By expressly refraining from agreeing to the terms of a lease which might never be made, and by obligating themselves to other definite provisions, they manifested an intention to be bound by what they did promise definitely without regard to whether or not they might be able to reach an agreement on a future lease, the possibility of which was at best uncertain." The trial Court's finding that, "The parties clearly thought the probabilities high that Wilson Company would rent the premises", is strongly supported by the fact that Wilson did actually lease from Kellett on October 14, 1946, which lease was later rejected by the trustees.[2]
While appellant does assert that it was solely a selling agency, and that without assurance of the availability of Kellett's manufacturing facilities it would not have made the contract, it does not dispute the trial Court's findings that, "* * * even if Coldaire could not enforce the rental provisions it could still obtain title to all its raw materials, parts, etc. which it needed to manufacture the cabinets. Paragraph one of the October contract indicates the possibilities of shipping elsewhere at least part of what Coldaire bought." Having in *694 mind that the cabinets were admittedly constructed to the designs and specifications furnished by Coldaire itself, the argument advanced fails to convince us that on this phase of the case the lower Court was clearly wrong in its finding that the contract was severable.
The reference to Exhibit "C" in paragraph five of the agreement reads: "Coldaire will assume obligations for all open purchase commitments of Kellett as set forth in Exhibit `C.'" Appellant claims that the items in Exhibit "C" were never agreed upon. The lower Court confirmed the Master's findings that the exhibit was in existence at the time the contract was executed and delivered by Coldaire's Vice President and that the latter was in charge of the negotiations between Kellett and Coldaire and had the opportunity to read it. Our own examination of the record reveals evidentiary corroboration of those findings and in view of the language of paragraph five we see no justification to disturb the lower Court's conclusion that these finding effectively dispose of appellant's contention regarding Exhibit "C".
The remaining item embraced in this appeal involves tools and the like fabricated by Kellett for Coldaire under the April con tract and for which Coldaire paid Kellett $40,260 as agreed. Additional tools made by Kellett brought the latter's cost for tools well above the $40,260 it received. The tools were never delivered to Coldaire and were still in the Kellett plant when the trustees took possession. Coldaire filed a petition for reclamation covering them alleging their value to be not less than $100,000. The trial Judge, confirming the Master's recommendation, dismissed the petition on the ground that there had been no sale of the tools which was binding on the trustees. The Court allowed an amendment to the petition to enable appellant to assert its claim to the $40,260 it had paid for the tools and gave the trustees the right to present any defenses and setoffs they might have.
As seen, Kellett had retained possession of the tools up until the time the trustees assumed control. With respect to such circumstances the Bankruptcy Act, Section 70, sub. c, 11 U.S.C.A. § 110, sub. c, states: "The trustee, as to all property in the possession or under the control of the bankrupt at the date of bankruptcy or otherwise coming into the possession of the bankruptcy court, shall be deemed vested as of the date of bankruptcy with all the rights, remedies, and powers of a creditor then holding a lien thereon by legal or equitable proceedings, whether or not such a creditor actually exists".
Since the rights of lien creditors are fixed by state law, Section 26 of the Uniform Sales Act, in force in Pennsylvania as 69 P.S. § 204, becomes important. That reads: "Where a person having sold goods continues in possession of the goods, or of negotiable documents of title to the goods, and such retention of possession is fraudulent in fact or is deemed fraudulent under any rule of law, a creditor or creditors of the seller may treat the sale as void."
Under the facts before us where there was nothing at Kellett which ear-marked the tools as Coldaire's property; with a dispute as to the sufficiency of the payments for them by Coldaire and a question of the latter's title to the tools arising from the wording of the April Agreement, the Pennsylvania decisions are in accord with the judgment of the District Court. In Shipler v. New Castle Paper Products Corporation, 1928, 293 Pa. 412, at page 420, 143 A. 182, at page 185, a case on almost identical facts, the court said: "From the early case of Clow v. Woods, 5 Serg. & R. [Pa.], 275, 9 Am.Dec. 346, to the latest declaration in Wendel v. Smith, 291 Pa. 247, 139 A. 873, it has uniformly been held in this state that there must be an actual or constructive delivery of property sold to protect against attaching or levying creditors of the seller, and, if nothing be shown which indicates an adequate change of possession, the transfer will constitute, as to them, a legal fraud." Retention was there held to constitute, "* * * a fraud in law, and, as to the creditors, acting through the receiver, was ineffective to transfer title." And see Callahan v. Union Trust Co., 315 Pa. 274, 172 A. 684; In re Messenger, D.C., E.D.Pa., 32 F.Supp. 490.
The judgment of the District Court will be affirmed.
*695 PER CURIAM.
This appeal involved two matters arising out of the bankruptcy of the debtor. The first was the dismissal by the District Court of appellant's proof of claim under its April 2, 1946 contract with the debtor. The second concerned appellant's petition for reclamation which claimed the value of certain tools purchased by the debtor for appellant. The petition for rehearing has to do solely with the proof of claim. The prayer of that petition is that it be granted "in order that the rights of The Coldaire Corporation with respect to the contract of October 9, 1946 may be determined."
Appellant's proof of claim was based entirely upon alleged breach by the debtor of the April 2, 1946 contract. No mention was made in the proof of any asserted rights of appellant under the October 9, 1946 contract. Appellant's whole theory of trying its claim before the Master to whom the matter was referred by the District Judge, was the same, namely, that the October contract was never consummated, the April contract remained in force, the latter had been breached by the debtor and appellant had thereby sustained ascertainable damages.
Confirming the Master's report, the District Judge, following his opinion, in his third conclusion of law specifically dismissed "Coldaire's proof of claim for breach of the April contract."
On appeal to this court appellant in its brief and orally, argued as it had below. At the bottom half of the forty-ninth page of its fifty page brief under the caption "Conclusion", appellant submits that it is entitled to damages arising from the debtor's breach of the April contract. It then and for the first and only time in the whole case until this petition for rehearing, mentions anything about possible damages to it under the October contract, saying that it also submits that if the October contract is held to be valid it is entitled to damages under the trustees' disaffirmance of that contract.
As seen, the question of what damages, if any, appellant might be entitled to under the disaffirmance of the October contract was not before the District Court or ourselves, directly or indirectly. It should not be necessary to so state but in order that there may not be any possible confusion, our action in affirming the judgment of the District Court was without prejudice to whatever rights, if any, appellant may have with respect to the disaffirmance of the October 9, 1946 contract by the trustees.
The petition for rehearing will be denied.
NOTES
[1] Under the doctrine of clear intent, the early case of Brown v. Spofford, 95 U.S. 474, 24 L.Ed. 508, is readily distinguishable on its facts.
[2] Appellees contend that their subsequent disavowal of the Wilson lease did not bring into effect the contingency of the failure of Wilson to rent from Kellett. Therefore they say that the lease by Kellett to Wilson completely destroys appellant's present point. In upholding, as we do, the lower Court's decision that the lease was severable, it is unnecessary for us to pass upon that question.