### McDONALD v. LOOMIS.

1. BILLS AND NOTES—DESTRUCTION OF NOTE—QUESTION OF FACT. In an action by an executor on a lost note, testimony by a disinterested witness that, when she was alone with testator on a certain day, he told her he had destroyed the note, which was contradicted by the testimony of other witnesses that she was not alone with testator on said day, *held,* to present an issue of fact for the jury.[1]

2. SAME—EVIDENCE—TESTATOR'S INTENT TO DESTROY NOTE. Statements by testator as to why and approximately when

[1] Bills and Notes, 8 C. J. § 1377.

he "made away with" the note, plainly asserted his intentional cancellation thereof, since "to cancel" is "to annul or destroy, make void, or set aside;" and "to make away with" signifies not only to put out of the way but to destroy.[2]

3. SAME—INTENTIONAL DESTRUCTION OF NOTE BY OWNER DESTROYS RIGHT OF ACTION UPON IT—ELEMENT OF GIFT IMMATERIAL.

Under the negotiable instruments law (2 Comp. Laws 1915, § 6160) the intentional destruction of a note by the holder and owner destroys his right of action upon it, and therefore it is immaterial whether the element of gift was more or less involved by the action of destruction.[3]

Error to Isabella; Hart (Ray), J. Submitted October 8, 1925. (Docket No. 35.) Decided December 22, 1925.

Assumpsit by Edward F. McDonald, executor of the last will of Allen F. McDonald, deceased, against Martin Loomis and others on a promissory note. Judgment for defendants. Plaintiff brings error. Affirmed.

*Dodds & Dodds*, for appellant.

*F. H. Dusenbury*, for appellees.

STEERE, J. Edward F. McDonald and John McDonald are sons of Allen F. McDonald, deceased, and Martin Loomis is a son-in-law. This action was brought by deceased's son Edward F. McDonald as his executor to recover upon a promissory note for $1,000 dated December 14, 1921, running for two years with interest at 6 per cent. per annum, given to deceased by defendant Martin Loomis and indorsed by John and Edward F. McDonald who waived presentment for payment, protest, notice of protest, etc., consenting to any renewal of the note which might be made. The action was begun by attachment

[2]Bills and Notes, 8 C. J. § 1355; [3]Id., 8 C. J. § 854.

against the property of defendant Martin Loomis, the maker of the note. The declaration is upon the common counts with a special count upon the note, a purported copy of which was attached, the correctness of which is not questioned. It is conceded such a note was given, indorsed as shown, and defendant Loomis admitted he had never paid it. Defendant Edward F. McDonald, who as executor made himself in person a defendant as indorser of the note, only pleaded the general issue. Defendants Martin Loomis and John McDonald pleaded the general issue, with special notice they would claim and show on the trial in their defense that the promissory note upon which the action was brought "was canceled and its liability extinguished prior to the death of plaintiff's intestate." It was admitted at commencement of the trial that the note had disappeared and could not be found by the executor. An objection was first raised by the defense on the ground that the action was not properly planted upon a lost note in compliance with the requirements of our statute on that subject, but provision having been made for giving the statutory bond required in such cases that objection was withdrawn and the trial proceeded. By defendant's admissions and plaintiff's proofs a *prima facie* case was established for plaintiff, and the one material issue in the case is that raised by defendant's special notice that the note had been destroyed and canceled by deceased. Our negotiable instruments act (2 Comp. Laws 1915, § 6160) provides so far as material here as follows:

"A negotiable instrument is discharged: *First,* * * * ; *Second,* * * * ; *Third,* By the intentional cancellation thereof by the holder." * * *

Under the testimony introduced by the defense to establish the cancellation, which was controverted by that of the plaintiff, the court submitted to the jury the question whether or not deceased had intentionally

canceled the note in question.    A verdict was rendered for defendants and judgment entered thereon.

Plaintiff's assignments of error are directed to refusal of requests, the contention that defendants' testimony raised no issue for a jury and if the court so finds the verdict was against the overwhelming weight of evidence, and errors in the charge.

Allen F. McDonald, to whom this note was given, died February 27, 1923, at his old homestead in Isabella county where he was living with a married daughter Edna J. Smith and her husband Harmon Smith, his wife having died a short time before he did.    Although his age is not disclosed by the record it is shown that he was survived by 9 children of mature age, most if not all of them married and living in different parts of Isabella county or Detroit.    His calling and former financial circumstances are left to inference, but at the time of his death his estate consisted of $2,603.15 in bank, a miscellaneous quantity of household effects and other personal property of uncertain value, a small amount of stock in an improvement company and a $100 note of a man named Flynn.    Plaintiff also included in the inventory of the estate the $1,000 note in question here.

Shortly before his final illness deceased executed a will which he had drawn up for him by an attorney of Clare, Mich.    By its terms he gave to his two daughters Emily Manley and Margaret Demitrea, of Detroit, Michigan, $500 each, and the residue of his estate to his son Francis A. McDonald (mentioned in the testimony as "Padie"), and nominated his son Edward as executor.    The will also contained the following paragraph:

"*Fifth.* The remaining members of my family, Edna J. Smith, daughter, of Vernon, Isabella county, Michigan; Edward F. McDonald, son, of Wise, Isabella county, Michigan; Charles E. McDonald, son, of

Vernon, Isabella county, Michigan; John A. McDonald, son, of Vernon, Isabella county, Michigan; Alice M. Loomis, daughter, of Vernon, Isabella county, Michigan; and Mary Harmon, daughter, of Wise, Isabella county, Michigan, have all been given such portion of my estate, heretofore, as I desire them to have, and for that reason are not made beneficiaries under this, my last will and testament."

When deceased was on his deathbed and his physician advised he was not long for this world, his children and others gathered at the old home and some of them were constantly watching with and caring for him until he died. He had serious difficulty in breathing at times, "smothering and choking," which was relieved by bolstering him up with pillows to a sitting position with some one partially supporting him there. In such service different members of the family were at times alone in his room with him. Some of them testified it was necessary to give him such support and attention all the time, while others testified it was not, but part of the time he lay quietly in his bed and conversed comfortably with those who were with him. He was taken seriously sick on Saturday and died the following Tuesday. Plaintiff himself told of sitting outside the door of his sickroom watching his father when there was no one in the bedroom with him and the latter said for him to come in and sit on the bed, which he did, asking him what he wanted, and his father said among other things, "You know the whole business transaction. You know all about the will I made, and I want you to collect those notes."

Deceased's married daughter Mary Harmon, who was there with the others during his last sickness, testified that about noon on the Sunday before he died she was present in the sitting room near the open door of the sickroom while her sister Mrs. Demitrea and sister-in-law Mrs. McDonald were caring for her

father; that Mrs. Demitrea went out leaving Mrs. McDonald sitting in a chair at the front of the bed near deceased until their uncle, Charles Carpenter, came in and relieved her.   He sat in the chair for a time and became drowsy.   He finally asked her if she would mind sitting alone with her father while he went out and took a smoke, to which she assented and took his place.   He then went out leaving her alone with her father.   While she was in the room alone with him she heard some loud whispering in the adjoining sitting room which her father also noticed.   She testified of what followed, so far as material here,

—"and father turned to me and in a low voice asked, 'Who is whispering out there?' and I said, 'I think it is Ed and Lulu,' and he said, 'What are they whispering about?' and I said, 'From what I heard, I think it is about the will that you made Tuesday.'   And he said, 'How did you know I had made a will on Tuesday?' because I hadn't been at home during that week, and I said, 'Because Mr. Edward McDonald had met my husband at the bank in town on a Thursday or Friday of that week, I am not sure, and had told him about the will father had made,' and he said, 'What did he say about it?'   I said, 'He said that you gave Margaret and Emily each $500 and the balance of your moneys to Padie,' and he said, 'What else did he say?' I said, he said, 'See when you are gone how damn quick Padie would be jumping on Martin's back for that note you held against him,' and he didn't say anything for a minute, and he says, 'Well, and he said that after he promised not to tell how I fixed that paper?'   Then he said, 'Well, when I am gone there won't be any paper for Padie to jump on Martin for. I got to thinking how I had gone against the old lady's wishes and how I might go as quick as she did and I got up the other morning before any one was up and made away with it.'   'Now, Mary,' he says, 'I don't wish you to tell this to any one unless you have to,' and I said, 'No,'   *   *   *   Father seemed provoked when he found out that Ed had told me what was in the

will.    I never said a word to anybody about this, except my husband, until after this suit was commenced."

It is urged for the plaintiff that Mrs. Harmon's claimed conversation with her father did not and could not take place because she was not in the sickroom alone with him that day.    This claim is based chiefly on the testimony of Mrs. Demitrea and Mrs. McDonald who testified they were in constant care of their father during that Sunday.    According to their general assertions one of them constantly remained at his bedside and "took care of him by holding him up and keeping him from choking."    Mrs. Demitrea testified of that day:

"I didn't see Mrs. Harmon do anything whatever for my father that forenoon, * * * I do not think that Mrs. Harmon or anybody took exclusive care of my father at all.    To my knowledge she was not there alone with him up to noon on Sunday.    I would have known it if she had been there alone. * . * * When I needed relief Mrs. Frank McDonald took the position with the same pillows behind him, and that is the way we kept him until he died."

Mrs. Frank McDonald testified to like effect and said: "Mrs. Demitrea and I were taking turns.    Absolutely no one else held him up that Sunday forenoon."    On cross-examination she admitted, "There was no reason why Mrs. Harmon couldn't come into that room and be alone with her father," but asserted "I know that she did not, I am positive about that."

Clearly there was an issue of fact for the jury as to whether Mrs. Harmon was alone with her father on that Sunday and had a conversation with him as she testified, in which he told her what disposition he had made of the note in controversy.

Neither are we persuaded that the verdict was against the overwhelming weight of evidence upon that controlling issue.    Mrs. Harmon's testimony is not without corroborating evidence.    She was not

interested as a beneficiary under the will, but one of those of whom testator stated in it that he had given such portion of his estate as he desired them to have, while Mrs. Demitrea was a beneficiary under the will as was also Mrs. Frank McDonald's husband, and to that extent they were interested parties.

Uncle Charles Carpenter, brother-in-law of deceased, was there during the latter's illness.    He attended the trial and was called to the witness stand by the defense.    He testified that he "was uncle of all these children, and had no interest in this case," said no one had called his attention to the matter or talked with him before he took the stand, but he distinctly remembered the incident of Mrs. Harmon being alone with her father as she testified; that he had been in the sickroom and helped to care for deceased a dozen times or so during his sickness.    He was in the room on that Sunday before he died sitting alone with him although there were others in the adjoining sitting room.    After he had been there for a time Mrs. Harmon came in and,—

"I says, 'You sit and watch him.    I am going out and have a smoke.'    When I went out of the room Mrs. Harmon and her father were there, and there was no one else in the room when I walked out.    I left Mary there alone with her father.    *  *  *  I don't know anything that took place while I was gone. I went out in the kitchen and filled my pipe and smoked.    *  *  *  I don't know how they found out what I know about this."

It is undisputed that this note was given to deceased, was never paid and was not due when he died.    Mrs. Smith, his daughter with whom he lived, testified that within a very short time after their father's death plaintiff came to her and asked that she search the house for papers; that they first got dinner ready and while the rest were eating she began the search and from an hour to an hour and a half after her father's

death plaintiff joined her in her search upstairs. They knew of this note and searched unsuccessfully for it. She was not able to find it and while they were together she gave plaintiff a couple of little boxes to look through and he finally said, "Never mind hunting any more, perhaps they are in the bank." After their father's funeral on Wednesday, as she stated, "Mrs. Demitrea and I went through every paper and parcel and everything in the two bedrooms my father and mother had. We failed to find the note." The note was never found. Mrs. Harmon's testimony that her father told her how and why he "made away with it" is the only explanation offered for its disappearance. Her credibility as well as that of all other witnesses was for determination of the jury in the light of surrounding facts and circumstances as shown.

When, as Mrs. Harmon testified, deceased said to her of the note that when he was gone "there would be no paper for Padie to jump on Martin for," stating why and approximately when he "made away with it," he as holder and owner plainly asserted his "intentional cancellation thereof." To cancel is to annul or destroy, make void, or set aside (Cent. Dict.), and "to make away with" signifies not only to put out of the way but to destroy (Id.). His intentional destruction of the note as holder and owner destroyed his right of action upon it. *Vanauken* v. *Hornbeck,* 14 N. J. Law, 178 (25 Am. Dec. 509).

"The cancellation of a bill or a note by the holder or with his consent may be effected by the destruction of the instrument." 8 C. J. p. 614.

"If the holder of an instrument intentionally destroys it, he thereby renounces his rights thereunder and may not maintain an action based upon the instrument. There can be no higher evidence of an intention to discharge and cancel a debt than by a destruction and surrender of the instrument which created it." 3 R. C. L. p. 1270.

Plaintiff's counsel further contend that if Mrs. Harmon's testimony is true it but shows an attempt on the part of deceased to make a gift of $1,000 to his son-in-law Martin Loomis, and that it cannot be held valid as a gift, since evidence of declarations and admissions of a donor are insufficient to establish a gift and only competent to corroborate other evidence, although destruction of the evidence of indebtedness by the holder with intent to release the debt is a forgiveness of the debt; citing authority to that effect.

Error is charged on refusal of the court to direct a verdict on that ground, and refusal to give plaintiff's request along that line. The court in instructing the jury at first said: "There is no question of gift in this case for your consideration;" but later said to the jury:—

"Gentlemen, I have told you that there was no question of gift in this case. I think I will correct that to this effect, that if you find that was a gift and was so intended by the deceased, and that he intended by destroying this note to give him a gift, then your verdict should be for the plaintiff for the amount, because that gift was not a full and complete gift, accompanied by the delivery of the note; but, if you find that the note was destroyed, as I have told you, with the purpose of canceling that note, discharging it, and not a gift in any way, then your verdict should be for the defendant. Otherwise it should be for the plaintiff for the amount I have told you."

Whatever error there may be in this instruction is in plaintiff's favor. While the elements of gift and forgiveness of debt may be more or less involved in the cancellation or destruction of the evidence of indebtedness, those elements do not figure in the provisions of our negotiable instruments law which now expressly provides without qualification or exception that "a negotiable instrument is discharged, * * * By the intentional cancellation thereof by the holder."

The purpose or intent of the holder beyond intent

to destroy his evidence of indebtedness is immaterial. That positive provision of our statute law is based upon the rule that the intentional destruction of a note or other security by the holder destroys his right of action upon it.   The reason for the rule is discussed at length in *Vanauken* v. *Hornbeck, supra,* wherein the question arose of whether plaintiff by destroying his note had not lost his debt, and the court in discussing the effect of a creditor intentionally destroying his evidence of indebtedness said in part:

"It is a clear principle of law, that if a deed be altered by the party to whom it belongs, even an immaterial part, such alteration avoids the deed (citing cases) ; and in *Master* v. *Miller*, 4 T. R. 321, affirmed in the Exchequer Chamber, 2 H. Bl. 141, and 1 Anstruther 225, it was settled upon great deliberation, that all the principles of public policy and private security, which forbid the alteration of deeds, apply with equal force to all written contracts, nay with greater propriety in bills of exchange and promissory notes.   *   *   *   To permit a party, intentionally to destroy his bond, note, or other security, and then come into court, in any form of action, and recover the debt or demand, of which the destroyed instrument was the best and proper evidence, would open the door to frauds without number."

The controlling issue of fact presented in this case under the pleadings and proofs was fairly submitted to the jury in a plain and impartial charge.   We find no reversible error either in rulings during the progress of the case or instructions by the court to the jury.

The judgment will stand affirmed.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.