44 N.J. Super. 391 (1957)
130 A.2d 640
IN THE MATTER OF THE ESTATE OF MARCUS KIRSCHENBAUM, DECEASED. CAMILLE MORRIS, EXECUTRIX OF THE ESTATE OF MORRIS KIRSCHENBAUM, DECEASED, APPELLANT, AND ANNA K. SCHMERER, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1957.
Decided April 3, 1957.
*393 Before Judges GOLDMANN, FREUND and CONFORD.
*394 Mr. E. Alexander Edelstein argued the cause for appellant (Messrs. Edelstein & Edelstein, attorneys).
Mr. Robert J. Novins argued the cause for respondent (Messrs. Novins & Novins, attorneys; Mr. William E. O'Connor, Jr., on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal from a judgment of the County Court, Probate Division, dismissing the complaint of plaintiff executrix seeking an order directing her to surrender a certain promissory note to its makers.
Plaintiff is the married daughter and executrix of Marcus Kirschenbaum who started a 5 and 10¢ business in Belmar and in August 1949 turned it over to his three sons, Leon, Joseph and Morton. In May 1950 Leon and Joseph executed a $40,000 promissory note to their father, payable on demand and representing a loan from him to help finance the business. He had borrowed $23,000 of this sum from a bank. The sons paid interest on the $23,000, but not on the remaining $17,000 which apparently came from decedent's own pocket. By January 7, 1953 they had paid off the bank loan, and on January 12 following Joseph and Leon gave their father their demand note of $17,000.
On October 31, 1953 decedent executed a will by which he named plaintiff his executrix and, after making a number of specific bequests and devises, left his residuary estate to her, his three sons, and his friend Anna Schmerer in equal shares. After his death seven days later, the note was found in a wallet in the trousers he was wearing when he died. Defendant Schmerer subsequently made demand upon plaintiff executrix to collect the note for the benefit of the estate. She refused, taking the position that her father had forgiven and cancelled the obligation in favor of his sons just before his death.
The executrix subsequently instituted this action, asserting that the note was not due and owing to the estate and demanding judgment directing her to surrender the note *395 to Leon and Joseph Kirschenbaum. Defendant Schmerer answered, claiming that the note was a valid and existing obligation and as such formed part of the assets of the estate. By counterclaim she demanded judgment compelling plaintiff to institute the necessary proceedings for the collection of the note or, in the alternative, surcharging her with $17,000 plus interest for failing to marshal estate assets. The County Court first heard the case without a jury, but then concluded that the matter should be tried to an advisory jury. This was done.
At the trial plaintiff testified that her father had told her "he gave the boys the rest of the note; they didn't owe him anything." Her husband told of a visit by decedent to the Morris home in September 1953, at which time he said that "the way he felt he didn't have long to live and that he was now giving over the $17,000 that the boys owed on the note; that he no longer wanted that paid to him." Leon Kirschenbaum, one of the makers of the note, testified that when his father came to the store in September 1953 to collect rent, he (Leon) offered to make another payment on the note, but decedent said "to forget about it; that he was forgiving the note." Joseph Kirschenbaum, the other maker, related the same incident, his testimony being that his father had said, "Forget about it. You don't owe it to us [me]." Plaintiff and her two brothers also testified that decedent never gave or offered to give his sons the note, or ever spoke about delivering it to them.
The trial judge submitted three questions to the advisory jury for the return of special verdicts:
(1) Whether from the facts of the case decedent in or about September 1953 had "a conversation or conversations with his sons, daughter or son-in-law wherein he made a statement that he was cancelling or had cancelled the indebtedness."
(2) Whether "there is an executed agreement or do you find that there is an executory agreement. By agreement the court means an agreement to cancel the indebtedness. A contractual right, of course, can only be extinguished by another contract. An executed *396 agreement is one in which nothing remains to be done by either party and where the entire transaction has been completed. An executory agreement is one in which something still remains to be done before the cancellation of the indebtedness was accomplished."
(3) Whether "there was love and affection existing between Marcus Kirschenbaum and his sons in September 1953, sufficient to support a cancellation of the indebtedness."
The court instructed the jury that if the agreement were found to be executory it need not answer the third question. The jury unanimously answered "yes" to the first question; as to the second, it found the agreement executory, by a vote of 11-1. It was not called upon to answer the third question. The court then entered judgment for defendant Schmerer.
It is apparent from the charge of the court that its theory was that if the transaction by which the note was alleged to have been forgiven could be regarded as executed, it would be effectively supported by evidence of love and affection as an adequate consideration, but if it was executory, a more substantial consideration would be required. Before the jury returned its special verdicts, counsel for plaintiff objected to the form of the second question because it called for a conclusion of law. There was a further objection on the ground that the answer to the first question was dispositive of the merits of the case.
The trial judge misconceived the law applicable to the particular question presented. That question was a purely legal one and the case should have been decided without submitting any of the questions to a jury. However, the result at which the trial court arrived was correct as a matter of law, assuming the truth of the facts adduced by plaintiff. Her contention that there was a discharge or renunciation of the note was properly rejected.
The obligation here involved was a promissory note, so that any claimed discharge or renunciation would be governed by the provisions of sections 119 and 122 of the Uniform Negotiable Instruments Act, R.S. 7:2-119 and 7:2-122. The first of these sections provides that negotiable instruments may be discharged in various ways, among them:

*397 "* * * * * * * *
III. By the intentional cancellation thereof by the holder; IV. By any other act which will discharge a simple contract for the payment of money;

* * * * * * * *."
R.S. 7:2-122, dealing with renunciation, provides:
"The holder may expressly renounce his rights against any party to the instrument, before, at or after its maturity; an absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument; but a renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon."
These two provisions should be read together.
Under the English common law, if the holder of a negotiable instrument relinquished his rights against the party primarily liable thereon and forgave him his obligation, the irrevocable discharge of such party would result despite the absence of any consideration. Foster v. Dawber (1851), 6 Exch. 839, 851; 155 Eng. Repr. 785. All that was necessary was that the relinquishment be accompanied by appropriate and express words. Dingwall v. Dunster (1779), 1 Doug. K.B. 247, 99 Eng. Repr. 161. This method of discharge, known as "renunciation," was unquestionably an anomalous doctrine, permitting as it did the irrevocable surrender of absolute rights by an act purely formal, and abrogating to that extent the common law dogma of consideration. The doctrine undoubtedly stemmed from a rule of the civil law adopted by the law merchant, and subsequently incorporated into the common law. Note, 12 Va. L. Rev. 414, 415-417 (1926); Byles on Bills (5th Amer. ed.), 322; Foster v. Dawber, above; McGlynn v. Granstrom, 169 Minn. 164, 210 N.W. 892 (Sup. Ct. 1926); Jones v. Wettlin, 39 Wyo. 331, 271 P. 217, 69 A.L.R. 840 (Sup. Ct. 1928); Gannon v. Bronston, 246 Ky. 612, 55 S.W.2d 358, 86 A.L.R. 324 (Ct. App. 1932).
The doctrine of renunciation as one method of discharging liability upon a negotiable instrument was expressly included *398 in section 62 of the English Bills of Exchange Act, 45 & 46 Vict., c. 61, enacted in 1882, "renunciation" there being used in its technical sense as applying to a gratuitous waiver of a claim. Though such renunciation could, previous to the enactment of the English act, be made by parol, it was deemed best by those who drafted the act to modify that rule, conforming it to the Scotch law, and to require such gratuitous waiver to be in writing unless the note or bill of exchange were delivered up. Chalmers, Bills of Exchange (9th ed. 1927), 250; McGlynn v. Granstrom, above. Section 122 of the Uniform Negotiable Instruments Act substantially incorporates section 62 of the English Bills of Exchange Act into the American statute.
The language of section 122 (R.S. 7:2-122) is unmistakable: it requires that the renunciation either be in writing or the negotiable instrument itself be delivered up to the person primarily liable thereon. Had there been an appropriate writing or delivery up of the note in this case, it would not have mattered that what the decedent did was purely voluntary and without consideration. But there was neither a writing nor a delivery, and so no renunciation within the meaning of R.S. 7:2-122.
However, plaintiff contends that decedent's statement that he was forgiving the note  his sons were to forget about it; they owed him nothing  constituted a discharge (plaintiff loosely uses the word "cancellation") of the obligation under R.S. 7:2-119. There was, of course, no payment of the note, R.S. 7:2-119(I) and (II), nor an "intentional cancellation thereof by the holder," R.S. 7:2-119(III). Cancellation calls for an intentional act upon the instrument itself, such as destroying it, McDonald v. Loomis, 233 Mich. 174, 206 N.W. 348 (Sup. Ct. 1925), or defacing it by marking it cancelled, Washington Loan & Trust Co. v. Colby, 71 App. D.C. 236, 108 F.2d 743 (App. D.C. 1940), or the like. See the cases collected in Brannan, Negotiable Instrument Law (7th ed. 1948), § 119(3), pp. 1112 ff.; and Copp v. Van Vleck, 104 N.J. Eq. 129 (Ch. 1929). It is conceded *399 that the note was retained by decedent and remained in his possession, unmarked and physically unimpaired, until the moment of death.
The argument is that there was a discharge of the note under R.S. 7:2-119(IV) by an act which would discharge a simple contract for the payment of money. 6 Williston on Contracts (rev. ed. 1938), § 1793, pp. 5102-3, lists 21 different ways in which a contractual duty may be discharged. Of these only two seem at all applicable here: "renunciation" and "cancellation." We have discussed cancellation. "Renunciation" is used by Williston in its general sense, and not in the technical sense of section 122 of the Negotiable Instruments Act. It would be wrong to read the provisions of that section into R.S. 7:2-119(IV) so as to create a special statute of frauds applicable to the discharge of negotiable instruments other than by payment. We must not fall into the error of some American courts  a distinct minority, by the way  in assuming that renunciation in section 122 of the uniform act, is a generic term synonymous with discharge under section 119.
Section 122 has reference to no other method of discharge than a technical renunciation, as that term was understood at common law in dealing with negotiable instruments. A renunciation valid under R.S. 7:2-119(IV) does not have to meet the requirements of R.S. 7:2-122. Under the latter, no consideration is required if there is a writing or a delivery up of the instrument. Under the former, the renunciation may be verbal, but consideration is required. Jones v. Wettlin and Gannon v. Bronston, above, discuss this difference at some length, the latter decision setting out an extensive list of authorities, the overwhelming majority of which support the view we have expressed. Consult also, Annotations, 69 A.L.R. 846 (1930); 86 A.L.R. 334 (1933); 121 A.L.R. 1353 (1939); Brannan, Negotiable Instruments Law (7th ed. 1948), § 119(4), pp. 1114 ff.; 6 Williston on Contracts (rev. ed. 1938), §§ 1832-1833, pp. 5184, 5186; 4 Ibid., § 1189, p. 3416; Note, 12 Va. L. Rev. 414 (1926).
*400 Decedent's mere statement that his sons could forget about the note, that they owed him nothing, was not sufficient to discharge the instrument under R.S. 7:2-119(IV), for there was no legal consideration to sustain the discharge. Plaintiff seeks to spell out a consideration of love and affection. In the first place, there is nothing in the record to show that what decedent did was motivated by, or given in return for, love and affection. But that aside, motive is not the same thing as consideration. Consideration is a present exchange bargained for in return for a promise. "If there be no legal consideration, no motive such as love and respect, or friendship for another, * * * or a desire to equalize the shares in an estate, or to provide for a child * * *," is sufficient to support the forgiving of an obligation, as is claimed here. 1 Williston, op. cit., § 111, pp. 377-8. "A moral obligation which has at no time been a legal duty will not, according to the great weight of authority, afford a consideration for the promise." Pascali v. Hempstead, 8 N.J. Super. 40, 43 (App. Div. 1950).
It has been loosely said that love and affection is sufficient consideration to support an executed contract, but will not support an executory one. 1 Williston, op. cit., § 110, p. 375; 12 Am. Jur., Contracts, § 78, p. 569 (1938); 17 C.J.S., Contracts, § 91, p. 438 (1939). Love and affection, unaccompanied by a pecuniary or material benefit, will not constitute a sufficient consideration to support a simple contract or an action to redress its breach. Cockrell v. McKenna, 103 N.J.L. 166, 169 (E. & A. 1926). While it is sometimes stated that love and affection is a good consideration in instruments of conveyance, Ibid., the more accurate rationale is that an executed conveyance under seal imports a solemn act which the parties intend to be binding without further consideration, and the courts will enforce their intent in such case. See United & Globe Rubber Mfg. Co. v. Conard, 80 N.J.L. 286, 291 (E. & A. 1910). Thus, love and affection was of no legal significance in the present case.
*401 Taking plaintiff's proofs on face, they fail to establish that the requirements of either R.S. 7:2-122 or R.S. 7:2-119 were satisfied in any way. The trial judge arrived at the correct result. Our appellate function is, of course, to review the judgment before us, not the reasoning by which it was reached.
Affirmed.