Samuel B. SLAUGHTER, Jr.

v.

The PHILADELPHIA NATIONAL BANK, Appellant,

v.

PEOPLES NATIONAL BANK OF CAMDEN COUNTY.

No. 17597.

United States Court of Appeals Third Circuit.

Argued June 5, 1969.

Decided Oct. 14, 1969.

Arthur R. Littleton, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant.

Burton Spear, Stassen & Kephart, Philadelphia, Pa. (Roger A. Johnsen, Philadelphia, Pa., on the brief), for appellee.

Before KALODNER, VAN DUSEN and STAHL, Circuit Judges.

## OPINION OF THE COURT

STAHL, Circuit Judge.

In this somewhat complex case we are called upon to determine whether the court below erred in refusing to set aside a jury verdict for plaintiff-appellee

Slaughter.[1] In order to comprehend fully the issues involved, it is necessary to set out the facts in some detail.

In 1962, appellee Slaughter and four other men, Brodie, Croft, Leighton and Tanis, agreed to join together to purchase the George W. Bennett Bryson Company (Bryson), a company with diversified business interests on the Island of Antigua in the West Indies. Trial Testimony (T.T.) 60–62. To that end they formed West Indies Company Limited (WICO), a Liberian corporation, to purchase and hold as its sole asset the shares of Bryson. Each of the five men, including appellee, received 38,000 shares of WICO common stock. Appellee did not pay cash for his shares but received them for services rendered to WICO.

To finance WICO's purchase of the Bryson stock, the five men, in December 1962, arranged to borrow $360,000. This transaction involved Doll-Stevens Associates, a corporation engaged, *inter alia*, in the placing of loans for projects of this nature, and Peoples National Bank of Camden County, New Jersey (Peoples), the former putting the deal together and then discounting or selling the loan to Peoples. (T.T. 208). As part of the loan transaction, the five borrowers were to execute a five-party note in the amount of $360,000, and a pledge agreement by which they agreed to pledge their total 190,000 shares of WICO common stock as collateral for the loan. Each of the five men was also to execute individually a note for $360,000 as additional security. Certain realty owned by some of the men was also to be used as collateral for the loan. If the note was repaid in twelve months, the entire $360,000 was due; if it was repaid within six months, the total obligation was to be $330,000. Appendix (App.) 14a, 75a.

When the time arrived for consummation of the loan, Slaughter was in Antigua. Because of his absence, Doll-Stevens took from the others and turned over to Peoples

(1) a four-party note in the amount of $360,000;

(2) individual promissory notes executed by all the principals save Slaughter;

(3) a pledge agreement similarly executed; and

(4) the WICO stock belonging to the four men.

Upon receipt of these documents and stock, Peoples issued a credit of $360,000 to Doll-Stevens and, at Doll's order, issued checks totaling $300,000 to WICO to enable it to complete the purchase of the Bryson stock. The understanding of the parties at the time was that appellee Slaughter, then in Antigua, would authorize the pledge of his shares of WICO stock and sign a similar note or notes as those already held by Peoples, prior to the disbursement of the funds in Antigua. The four-party note Doll-Stevens had obtained was to be replaced by a five-party note executed by Slaughter as well as the other four men.

Early in January 1963, this understanding was carried out and prior to the delivery of the checks in Antigua, Slaughter signed a five-party note for $360,000, a security note individually for $360,000, and a five-party pledge agreement. (T.T. 111–112.) Upon receipt of the checks, WICO completed the purchase of the Bryson stock.

Before leaving for Antigua to complete the transaction, Harry Doll, President of Doll-Stevens, had judgment entered in Montgomery County, Pennsylvania, on the four-party note that had previously been executed.[2]

1. The district court opinion of September 18, 1968, is reported at 290 F.Supp. 234 (E.D.Pa.1968).

2. It is clear that Doll entered judgment on the four-party note and subsequently had the judgment marked satisfied. It

is not clear whether Doll acted similarly with respect to the individual notes he had received from the four associates other than Slaughter, (T.T. 189, 191, 211, 212), although the opinion of the lower court would seem to indicate that he did. 290 F.Supp. at 237.

Upon his return to the United States, Doll transmitted the five-party instruments he had received to Peoples, as had been agreed upon, but he did not return the four-party note to its makers.

Thus far, then, in terms of the legal relationships created, Doll-Stevens became an endorser of the notes executed by the five parties which it discounted and assigned to Peoples National Bank of Camden County.

Within a few months after WICO's purchase of the stock, Bryson's financial posture began to weaken and Doll, though not holding the notes or the collateral at this time, advised all five of the borrowers that he wanted the loan paid off not later than six months from the date it had been made.

Whether as a result of Doll's pressure or at the suggestion of Peoples, or possibly both, Brodie, Croft and Leighton, and their wives, and Tanis alone, executed new notes in favor of Peoples. Slaughter and his wife refused to sign a new note, and at about this time Slaughter demanded from Peoples the return of his 38,000 shares of WICO stock being held as collateral. Peoples refused to honor this request.

The new notes were received by Peoples on June 14, 1963. At about the same time Peoples asked the appellant, The Philadelphia National Bank (PNB), if it wished to participate in the loan. PNB agreed to do so on a 65% basis, advancing $214,500,[3] and receiving a Participation Certificate issued by Peoples. (App. 70a.) Peoples continued to administer the loan and was designated as the "lead" bank.

In early April 1964, the Bryson financial situation had deteriorated further to the point where large bank creditors of Bryson exercised their rights under certain loan agreements and placed Bryson in involuntary receivership in Antigua. Evidently as a result of this development and because much of the collateral securing Peoples loan was located in Pennsyl-

vania, the two banks decided that PNB should become the lead bank and administer the loan. Accordingly, on April 21, 1964, PNB issued a Participation Certificate to Peoples and took possession of the security held by Peoples, including appellee Slaughter's shares of WICO stock.

On July 8, 1964,[4] Slaughter, or his attorney, made a demand upon appellant PNB for the return of his stock. This request was refused, and on July 30, 1964, Slaughter initiated a replevin action against PNB in the Philadelphia Court of Common Pleas seeking the return of his stock and damages alleged to have resulted from the unlawful detention of the security. PNB removed the action to the district court and brought in Peoples National Bank of Camden County as a third-party defendant upon an indemnification claim. Peoples then filed a claim against Slaughter for nonpayment of the note underlying the entire transaction.

In March 1965, prior to trial, PNB returned appellee's stock to him. Therefore, at trial, Slaughter's sole claim was for damages suffered by reason of a diminution in the value of his stock between June 1963, when Peoples made the new loan to the four men and PNB became a "participant" in the loan, and March 1965, when the stock was returned to him. It was conceded by the parties (Appellee's Brief, p. 6) that at the time this action was filed, on July 30, 1964, the shares of stock were completely worthless.

At trial appellee sought to prove that the retention of his stock after Peoples made the new loan, in June 1963, was unlawful on the theory that the new notes accepted by Peoples from the other four men and some of their wives constituted a new transaction and "paid" or "discharged" the old note or notes. The banks attempted to show that the new notes were not taken in satisfaction of but rather as additional collateral security for the existing debt.

In seeking to hold PNB liable as of the date the appellant bank first participated

---

3. This was on the basis of a new loan of $330,000.

4. See ¶ XV of appellee's complaint and appellant's answer thereto.

in the loan, June 17, 1963, appellee Slaughter alleged in his complaint, and tried to prove at trial, that during the period from June 17, 1963 until April 21, 1964, while Peoples administered the new loan and held appellee's stock as security, Peoples was acting as PNB's duly authorized agent.

After a seven-day trial, the jury, pursuant to F.R.Civ.P. 49(a), returned a special verdict in the form of special written findings upon a number of questions of fact presented to it. The jury found first that PNB did not have the legal right to retain appellee's stock as collateral security after it had physically received the stock from Peoples on April 21, 1964. The jury also found that while the stock was in the possession of Peoples, but after PNB had become a participant in the loan, i. e., between June 17, 1963 and April 21, 1964, PNB had not exercised control nor did it have the right to exercise control over the stock sufficient to make Peoples its agent. (App. 96a.)

The jury awarded appellee compensatory damages in the amount of $47,500 against PNB, the verdict evidently being predicated upon the jury's determination that appellee had suffered damages "from either bank's retention of his stock." [5]

The jury also awarded $35,000 in punitive damages against PNB. A verdict was rendered in PNB's favor, as third-party plaintiff, over against Peoples for $41,250, and there was a verdict for Slaughter on Peoples' claim against him for repayment of the original loan.

In response to motions for judgment n. o. v. and for a new trial filed by both banks, the district court held,[6]

(1) that since the jury had been instructed that Peoples would be liable over to PNB only in the event that a principal-agent relationship between the two banks were found to exist, and since the jury had decided there was no agency relationship, the verdict in PNB's favor in the third-party action was "perverse";

(2) that the jury's findings in Slaughter's favor against PNB was amply supported by the evidence;

(3) that Slaughter's damages, the decline in the value of the securities from the date of the illegal detention to the date of their return, could be and were proven by evidence [7] tending to show, in the absence of an established market for

---

5. The two special findings of the jury upon which this award of damages was predicated were:

3. If defendant Philadelphia National Bank had no legal right to retain plaintiff's stock as collateral (Question 1), or if People's [sic] National Bank was Philadelphia National Bank's agent (Question 2(a)) and had no legal right to retain plaintiff's stock as collateral (Question 2(b)), did plaintiff suffer any monetary loss from either bank's retention of his stock?

Yes √ No

4. If your answer to Question 3 is "YES":

(a) in what amount do you find that plaintiff suffered damages from either bank's retention of his stock?

*$47,500*

\* \* \* 290 F.Supp. at 240.

6. After argument before the district court both banks withdrew the motions for a new trial. However, the court, on its own motion, initially set aside the judg-

ments and granted a new trial to both banks *on all issues*, holding that the inconsistency in the jury's answers to the special interrogatories warranted such relief. (The district court's first opinion, dated July 17, 1968, which is unreported, appears at App. 80a.) After PNB filed a motion to vacate that order, the court issued a second opinion and order, the one subsequently outlined in the text, in which, *inter alia*, Slaughter's verdict was upheld. See 290 F.Supp. at 235, 239.

7. In determining the damages the jury seemed to be greatly influenced by the $1.25 price per share fixed for the stock in a Buy-Sell Agreement entered into by Slaughter and the other four men. See note 20 *infra*.

In upholding the award of the compensatory damages, 290 F.Supp. at 237–239, the district court did not specify the date on which PNB's illegal retention presumably commenced.

the shares, the stock's intrinsic value; and

(4) that appellee had failed to sustain the burden of proof imposed upon him to establish a right to punitive damages against PNB.

The district court accordingly set aside the judgment entered in favor of PNB as third-party plaintiff and ordered a new trial on PNB's claim against Peoples, and granted the motion for judgment n. o. v. with respect to the award of punitive damages against PNB in favor of Slaughter.

The court also concluded that the inconsistency discussed in item (1) above had no application to Slaughter's verdict of $47,500 against PNB which the court therefore permitted to stand. 290 F. Supp. at 236.

PNB has appealed from the judgment in favor of appellee Slaughter, and the only issues in this appeal concern the rights and liabilities between these two parties.

### Discharge of Slaughter on Original Note or Notes.

Appellant argues first that the intention of the parties as expressed in the various documents, viz., the pledge agreement, the five-party note, and the security notes, was clear: the pledge of WICO's stock was to secure the complete payment of the $360,000, thus making retention of Slaughter's shares of WICO's stock by the banks proper.

■■ Appellant directs us to several New Jersey cases [8] in support of its contention that Slaughter was not discharged as a debtor, pledgor or guarantor by novation. We do not find the cases relied upon by appellant to support the proposition for which they were advanced. Rather we find the governing New Jersey cases to state the rule that whether there has been a novation effecting a discharge depends upon the intention of the parties, and that the resolution of the problem when there are disputed questions of fact is properly for the jury.

Appellant relies primarily on Pignone v. Brooks, 120 N.J.L. 258, 199 A. 372 (1938), a case involving a contract claim, where some of the defendants argued that a previous settlement agreement precluded a suit against them on the contract. Appellant suggests that the *Pignone* case stands for the proposition that, as a matter of law in New Jersey, a "new note" given for an existing or antecedent debt does not discharge that debt. The case does not establish such a rigid legal principle, however. To the contrary, the court stated that "whether a note, given for a debt, is payment, if not itself paid, depends upon the agreement of the parties," 199 A. at 373, and held that the

---

**8.** The parties do not question the district court's conclusion that New Jersey law is applicable because "the 'center of gravity' of the various transactions occurred in that State." 290 F.Supp. at 236. The original notes and pledge agreement were executed and delivered in New Jersey by all the borrowers except appellee and accepted there, and the loan was to be repaid in New Jersey.

Pennsylvania's approach to choice of law problems, which we must follow, Klaxon Co. v. Stentor Electric Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Miller, Inc. v. Needham, 122 F.2d 710 (3d Cir. 1941), is to analyze the policies and interests underlying the particular issue before the court and then apply the law of the state having the greatest interest and most direct contacts with the problem. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796, 805 (1964); Mannke v. Ben-

jamin Moore & Co., 375 F.2d 281, 283 (3d Cir. 1967); Seneca Falls Machine Co. v. McBeth, 368 F.2d 915, 916 (3d Cir. 1966). Using this kind of approach it is clear that New Jersey's contacts with the transaction make that state's interests more substantial than that of Pennsylvania.

The pre-*Griffith* approach followed by the Pennsylvania courts was that matters connected wtih the performance of a contract are governed by the law of the state where performance was due. *See* Johnson v. Fenestra, Inc., 305 F.2d 179, 181 (3d Cir. 1962). To the extent the problem here is viewed as one of discharge of contractual obligations, New Jersey law would still apply, that state being the place where the contract was entered into. *See* Miller, Inc. v. Needham, *supra*; Tenant v. Tenant, 110 Pa. 478, 1 A. 532 (1885).

lower court erred when it ruled as a matter of law that the agreement operated as a substitute contract and not an executory accord.[9]

Other authorities uniformly state, as did the court below, 290 F.Supp. at 237, that whether the giving of a new note pays off the old depends upon the intention of the parties. *See* Landau v. Rosenbaum, 15 N.J.Super. 524, 83 A.2d 732, 737 (1951); Union Cleaners & Dyers, Inc. v. Zeidman, 113 N.J.L. 86, 172 A. 546, 548 (1934), and cases cited therein. *See also* Newtown Title & Trust Co. v. Admiral Farragut Academy, 84 F.Supp. 527, 530 (D.N.J.) (Judge Forman), aff'd per curiam, 178 F.2d 406 (3d Cir. 1949); Annot., 52 A.L.R. 1416 (1928).

■ While the *Pignone* and *Union Cleaners* cases do not deal with an alleged novation but rather with problems of executory accord or substitute contracts, the applicable principle is the same when the issue is novation, *i. e.*, what was the intention of the parties. Mayfair Farms Holding Corp. v. Kruvant Enterprises Co., 64 N.J.Super. 465, 166 A.2d 585 (1960), vacated on other grounds, 35 N.J. 558, 173 A.2d 905 (1961); Alexander v. Manza, 22 N.J.Misc. 88, 36 A.2d 142, 148 (1944); Sixteenth Ward Building & Loan Ass'n v. Reliable Loan, Mortgage & Security Co., 125 N.J.Eq. 340, 5 A.2d 753 (E. & A.1939); Morecraft v. Allen, 78 N.J.L. 729, 75 A. 920 (E. & A. 1910); Annot., 61 A.L.R.2d 755 (1958).

In New Jersey the existence of an intention to effect a novation need not be shown by express words but may be implied from the conduct of the parties and other surrounding facts and circumstances. Wecoline Products, Inc. v. Carman & Co., Inc., 109 F.2d 736 (3d Cir. 1940); Mayfair Farms Holding Corp. v. Kruvant Enterprises Co., *supra*; Sixteenth

Ward Building & Loan Ass'n v. Reliable Loan Co., *supra*.

And while novation is never presumed, Tolland v. Lista, 46 N.J.Super. 272, 134 A.2d 601 (1957); J. Shlainsey, Inc. v. Aitken, 127 N.J.L. 246, 21 A.2d 764 (E. & A.1941), the New Jersey rule that in order to effect a novation there must be such an intention on the part of all concerned, *i. e.*, the creditor, the new debtor and the old debtor, Tolland v. Lista, *supra*; J. Shlainsey, Inc. v. Aitken, *supra*, seems much less rigid than it once was, although still followed in some cases, In re Estate of Carpentiero, 102 N.J.Super. 395, 246 A.2d 72, 77 (1968). Indeed, in the *Mayfair Farms Holding Corp.* case, the court stated that "[b]oth reason and sound authority support the concept that assent by the original debtor to his discharge is not a requisite for novation. A debtor can be discharged without his knowledge or consent." 166 A.2d at 591. *Accord*: 6 Corbin on Contracts §§ 1297–1299 (Rev. ed. 1962).

■ Citing In re Kirschenbaum's Estate, 44 N.J.Super. 391, 130 A.2d 640, petition for certification denied, 25 N.J. 51, 134 A.2d 754 (1957), appellant argues further that under New Jersey law, unless a note is surrendered or a written agreement executed indicating that the note is discharged, the obligation evidenced by that note still exists. The claim in *Kirschenbaum* was that decedent, prior to his death, had orally cancelled an obligation owing from his sons. A demand note executed by the sons was found in decedent's wallet. Since the obligation involved was a negotiable note, any claimed discharge or renunciation was governed by the provisions of §§ 119 and 122 of the former New Jersey Uniform Negotiable Instruments Law.[10]

---

9. We have held previously that the law of Pennsylvania is the same as that expressed in *Pignone*. In re Kellett Aircraft Corp., 173 F.2d 689, 693 (3d Cir. 1949).

10. Section 119 provided that negotiable instruments might be discharged in various ways, among them,
 III. By the intentional cancellation thereof by the holder;

The court, in construing those sections, held that renunciation could only be shown by a writing or by delivery of the instrument but that if consideration were given for the discharge this requirement was not applicable. The holding of the case, then, is not as narrow as appellant asserts. In interpreting the N. I. L. sections, the court recognized that a negotiable instrument may be discharged by an act which would discharge a simple contract for the payment of money.[11] The court found the sons' claim of love and affection as supporting a discharge insufficient legal consideration. Insofar as the applicability of *Kirschenbaum's Estate* is concerned, therefore, it was not improper for the jury to find from the facts here that the execution of the new notes by the other parties constituted sufficient consideration for the discharge or cancellation of appellee Slaughter's liability.[12]

Appellant also suggests that the taking of a note for a secured claim does not constitute the abandonment of the security posted as collateral for the old note. Union Cleaners & Dyers, Inc. v. Zeidman, *supra*. That case involved an alleged accord and satisfaction, and held that a note which was not taken as satisfaction did not preclude the creditors from readvertising and selling personal property of the debtor previously levied upon under a judgment when the note was not paid. The note in question was one of three given by the debtor following a levy upon his property and was intended to prevent its sale. The court's statement that a lien security is not abandoned by the creditor's taking notes for a lien claim appears to refer to the situation where there was no agreement or intent that the new note be taken in satisfaction of the debt.

IV. By any other act which will discharge a simple contract for the payment of money.

Section 122, dealing with renunciation, provided that,

The holder may expressly renounce his rights against any party to the instrument, before, at or after its maturity; an absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument; but a renunciation does not affect the rights of a holder in due course without notice; a renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon.

These sections of the N.I.L. have been reenacted, with some clarification, as part of the New Jersey Uniform Commercial Code. See 12A N.J.S.A. § 3–605.

11. To the extent that Article 3 of the Uniform Commercial Code has applicability to this case, 12A N.J.S.A. § 3–601, dealing with discharge of parties from liability on an instrument, provides, similarly to *Kirschenbaum's Estate*, that:

(2) Any party is also discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money.

Since appellee claims discharge by way of novation, we believe in light of the quoted section that the authorities we find controlling are applicable whether appellee be viewed as maker, guarantor or pledgor.

12. It should be noted that a finding that plaintiff-appellee's debt was discharged is implicit in the jury's answer to Interrogatory number 1:

1. Did defendant Philadelphia National Bank have the legal right to retain plaintiff's stock as collateral security after it received the stock from People's [sic] National Bank?

Yes ____ No √ (290 F.Supp. at 240.)

The district court said in its opinion that "[t]his dispute was decided by the jury in plaintiff's favor," 290 F.Supp. at 236, and then concluded that there was sufficient evidence to sustain such a finding. 290 F.Supp. 236–237.

Also supporting this determination was the jury's verdict in favor of Slaughter against the claim of the third-party defendant below, Peoples National Bank of Camden County, for payment of the underlying note.

While in the unlimited new trial of Slaughter against PNB we are directing herein the finder of fact may make a different determination, the point is that this is properly a factual issue for the jury.

That intention is the controlling factor and that a security may be considered released or surrendered if the creditor so intends is recognized in a number of New Jersey cases. What must be found is "some act or word by the creditor * * * clearly manifesting an intention of relinquishing or foregoing his right." Hutchinson v. Swartsweller, 31 N.J.Eq. 205, 207 (Ch.1879). *See also* Sixteenth Ward Building & Loan Ass'n v. Reliable Loan Co., *supra;* Shipman v. Lord, 58 N.J.Eq. 380, 44 A. 215 (Ch.1899), aff'd per curiam, 60 N.J.Eq. 484, 46 A. 1101 (E. & A.1900).

The question of release of the collateral is, we think, but a part of the main issue, *i. e.*, whether Slaughter's obligations in connection with the original loan were discharged. As we have noted, resolution of this question turns on the intention of the parties, an issue best resolved by a consideration of the facts.

Turning to the facts, we cannot say that the district court erred in submitting the case to the jury. Among the items of evidence which the court had before it were the following: Slaughter's refusal to execute or to have his wife execute a new note; the failure of either bank after the execution of the new loan in 1963 to make demand upon appellee for payment; and the fact that PNB's records nowhere listed Slaughter as a borrower. (T.T. 379–381.)

Also significant is the fact that the original loan, if not paid within six months, obligated the borrowers to repay $360,000, but if the loan was repaid within that time the obligation was only $330,000. The new loan, made within six months of the original, was for $330,000, the lesser sum under the original loan. From these facts the jury could readily infer that the new loan paid off the old.

The parties, of course, had conflicting explanations for these and other factual matters. Resolution of such conflicts was properly left to the jury, Alexander v. Manza, *supra,* and viewing the evidence in the light most favorable to appellee,[13] we believe a finding of discharge of Slaughter from the original loan was permissible.

### Liability of PNB Prior to April 21, 1964

Appellant PNB argues next that the jury's answer to Interrogatory 2 (a),[14] that there was no agency relationship between PNB and Peoples while the latter was in possession of the stock, was inconsistent with the theory subsequently advanced by appellee in seeking to hold PNB liable for detention damages after it became a participant in the loan but while Peoples was the lead bank holding the collateral. In other words, in light of appellee's trial theory and the court's charge,[15] the jury's answer to the above Interrogatory precludes the finding that PNB was liable in damages for illegal detention before it actually took possession of the stock on April 21, 1964.

Furthermore, appellant contends that the only evidence on damages proffered by appellee related to the value of the stock in June, 1963, when *Peoples* refused to return it. Thus PNB asserts that if its liability for detention of appellee's stock did not begin until some time subsequent to June 1963, the jury could not properly award damages

13. Sowizral v. Hughes, 333 F.2d 829 (3d Cir. 1964).

14. The jury answered "no" to the following question:
While plaintiff's stock was in possession of People's [sic] National Bank, did defendant Phildelphia National Bank exercise control or have the right to exercise control over the stock sufficient to make People's [sic] its agent in this matter? 290 F.Supp. at 240.

15. In its charge, the court said:
If the People's [sic] National Bank was acting under the control of the Philadelphia National Bank when it held the plaintiff's stock, then if you find this to be the case, you may find Philadelphia National Bank liable to the plaintiff, as if it itself had been detaining plaintiff's stock illegally.
So that you can go all the way back to the previous date. (Supplemental App. 4b.)

against it because there was no evidence of the value of appellee's WICO stock at any time after June 1963.

In his brief, appellee argues for the first time that PNB was a co-principal with Peoples in the negotiation of the new loan in June 1963, and because of that legal relationship the stock was in the joint possession and control of both banks from the time PNB became a participant. Without any citation of authority, appellee urges us to hold as a matter of law that PNB's liability thus began in June 1963.

In response appellant contends that appellee may not, on appeal, change the theory of his case. *See* Tromza v. Tecumseh Products Co., 378 F.2d 601, 604 n. 4 (3d Cir. 1967); In re Linda Coal & Supply Co., 255 F.2d 653, 656 (3d Cir. 1958).

We need not decide whether this is a proper case for application of the rule that "[a] successful party in the District Court may sustain its judgment on any ground that finds support in the record" Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957).[16] On the record of this case we cannot say as a matter of law that appellant PNB and Peoples were co-principals.

Furthermore, we agree with appellant that there was lacking record evidence of damages sufficient to enable the jury to make an award in Slaughter's favor once the jury found that PNB did not control, or have the right to control, the stock until April 21, 1964. An agency relationship was the only theory upon which a finding of liability against PNB, *prior to its possession of the stock*, could be based and, of course, the jury rejected the agency theory.

On the issue of the banks being co-principals as a matter of law by virtue of the Participation Agreement, the record presents a dearth of evidence as to the intention of the banks or the rights of PNB, other than the right to its proportionate share of the repayments of principal plus six percent interest.

We assume that appellee is asserting that by agreement the two banks were joint venturers and hence, as a result of that relationship, co-principals. "The *sine qua non* of joint venture is a contract purposefully entered into by the parties." Wittner v. Metzger, 72 N.J.Super. 438, 178 A.2d 671, 674, petition for certification denied, 37 N.J. 228, 181 A.2d 12 (1962), followed in National State Bank of Newark v. Terminal Construction Corp., 217 F.Supp. 341 (D.N.J.1963), aff'd per curiam, 328 F.2d 315 (3d Cir. 1964).

In addition to a contractual basis, other requirements have been deemed essential before a joint venture will be found. As the court stated in *Wittner,* some or all of the following elements must be present:

(A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;

(B) A joint property interest in the subject matter of the venture;

(C) A right of mutual control or management of the enterprise;

(D) Expectation of profit, or the presence of "adventure," as it is sometimes called;

(E) A right to participate in the profits;

(F) Most usually, limitation of the objective to a single undertaking or *ad hoc* enterprise. 178 A.2d at 675.

*Wittner* is helpful here. In that case the parties, both of whom were factors, entered into agreements providing for their joint participation in financing notes and accounts receivable. A dispute arose when Metzger refused to contribute toward sums repaid by Wittner to the trustee in bankruptcy of a debtor

---

16. For other cases dealing with this rule, see Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 405 F.2d 176, 178 n. 1 (3d Cir. 1968); United States v. Webber, 396 F.2d 381, 388 n. 15 (3d Cir. 1968).

who had made certain payments to Wittner within four months prior to bankruptcy. Metzger had received a share of such payments pursuant to his agreement with Wittner. In seeking to hold Metzger liable for a proportionate share of the losses, it was asserted that the two parties were joint venturers. Metzger claimed by way of defense that he had purchased only a "participation" in the collections, and that the agreements did not establish a joint venture.

In finding that the detailed written agreements in the *Wittner* case did establish a joint venture, the court determined upon scrutiny of the agreements that the controlling elements of a joint venture were present. The court noted, in light of the fact that Wittner was the manager of the venture, that "a joint adventurer may entrust actual control of the operation to his co-adventurer and it still remains a joint venture." 178 A.2d at 676. The entrusting party's rights and liabilities do not change, however, since a joint venture implies that a mutual agency exists among the participants. 48 C.J.S. Joint Adventures § 5 (1947).

Unlike the agreements in *Wittner*, the Participation Certificate Peoples issued to appellant PNB in June, 1963, is quite brief. After setting forth that PNB had advanced $214,500 toward a loan of $330,-000 made by Peoples, the document provided that all payments will be applied pro rata, that costs will be apportioned between the parties, that Peoples will hold, administer and liquidate the loan and dispose of the collateral, if any, subject to PNB's approval, and that Peoples will remit to PNB, when received, the interest on the latter's shares of the loan. App. 70a, 71a.

Beyond the Certificate itself, there is very little evidence dealing with the relationship between the banks. Both sides seek to find meaning in the testimony of a PNB vice president,[17] but we deem his testimony insufficient, even when coupled with the other testimony on this issue, to enable us to decide as a matter of law that PNB and Peoples were co-principals.[18] For these same reasons we cannot agree with appellee that the material facts from which agency may be inferred are present in the record in undisputed form and that the only conclusion that can reasonably be drawn is the existence of an agency relationship. The jury found directly to the contrary.

Thus since the evidence on damages offered by appellee Slaughter dealt almost entirely with the value of the stock as of June 1963, we must conclude that the district court erred in allowing the jury's award of compensatory damages

17. The testimony of E. C. Archer, in response to questions from appellee's attorney, was as follows:

> Q. In other words, at some point in time you took over this loan; and will you explain to the jury what that means?
> A. Yes, sir.
> In June of '63, the People's [sic] National Bank asked us to take a participation in their loan, which meant that they would administer. The documents were all drawn in their name. We simply bought a piece of their business.
> In April, we decided it would be advantageous for us to administer, Philadelphia.
> Q. April of what year, sir?
> A. '64.

> We put the entire loan on our books and gave them a participation back. The actual shares stayed the same. App. 53a.
>
> &ast; &ast; &ast; &ast; &ast;

18. In a case cited by appellant involving a bank's participation in a loan, In Matter of Yale Express System, Inc., 245 F.Supp. 790 (S.D.N.Y.1965), the court found that only the lead bank was a creditor of the borrower and held therefore that the participating bank could not, upon the borrower's default, claim the balance in an account maintained by the borrower in the participating bank. This case supports appellant's contention that it would be improper to hold as a matter of law that PNB was either a co-principal with or the principal of Peoples.

to stand. The jury had rejected the only argument presented to it by which a finding of liability on the part of PNB as of June 1963, prior to the time appellant had possession of the stock, could be made, *i. e.*, agency. In light of the record evidence of damages, the verdict in appellee's favor cannot stand.

### Liability of PNB On or After April 21, 1964

This does not end the matter, however, as we believe appellee is entitled to try to prove the value, if any, of his WICO stock on the date appellant PNB became liable for its detention. In deciding this question it will be necessary for the court and jury to determine first whether PNB was under a duty to return the stock immediately when it acquired possession of the collateral in April 1964, even though no express demand for its return appears to have been made until July 8, 1964.[19]

If an express demand is essential, PNB's liability may not have arisen until the July 8, 1964 date. This issue assumes importance in view of appellee's admission that at the time this action was filed,

July 30, 1964, the shares of stock were completely worthless. (Appellee's Brief, p. 6.)

Resolution of this issue would seem to turn on a number of factors, including the question of whether PNB can be charged with notice of appellee's June 1963 request to Peoples for return of his stock at the time PNB acquired possession of the collateral in April 1964.

▪ In attempting to prove value on April 21, 1964, or on whatever subsequent date PNB's duty to return the shares to Slaughter first arose, considerations pertinent to the value of the shares must be considered.[20]

In summary, we conclude that on this record:

(1) It was proper for the jury to find that appellee's obligation was discharged in June 1963;

(2) It was proper for the jury to find that appellant PNB was not Peoples' principal by virtue of its "participation" in the loan in June 1963, and

---

19. It should be noted that in its answer to Interrogatory number 1, the jury determined that PNB did not have the legal right to retain appellee's stock after receiving it from Peoples. 290 F. Supp. at 240.

20. Since a close corporation is involved, these considerations may include book or net asset value, earnings, dividend record, restrictions upon the sale of the stock, the minority position of Slaughter's stock, and any other criteria which "will likely gauge the thinking of one who desires but is not compelled to sell and one who is willing but not compelled to buy." Bassett v. Neeld, 23 N.J. 551, 130 A.2d 1, 4 (1957). *See also* Judson v. Peoples Bank & Trust Company, 25 N.J. 17, 134 A.2d 761, 767–768 (1957). In determining the measure of damages the law of the place of performance should be followed. *See* Robert H. Fox Co. v. Keystone Driller Co., 232 F.2d 831 (3d Cir. 1956), applying Pennsylvania rule; Annot., 50 A.L.R.2d 227 (1956).

A 1963 Buy-Sell Agreement entered into by Slaughter and the other four orig-

inal organizers of WICO provided that anyone desiring to sell his shares was required to offer them to the others for a specified period prior to sale to outsiders at a fixed price of $1.25 per share. (App. 18a; T.T. 95, 96.) This agreement would be relevant to a determination of any loss appellee allegedly suffered. In fact, as previously indicated, the value of the stock fixed in the Buy-Sell Agreement was the apparent basis for the jury's computation of damages as of the 1963 date. Whether the Buy-Sell Agreement would still be a significant factor as of April 21, 1964, or any later date, in view of WICO's financial situation at that time, is a matter of proof by appellee and ultimate determination by the jury.

Appellee asserts in his brief, p. 16, "that the price established by the Buy-Sell Agreement * * * remained unaltered as a continuing indication of minimum value from January 1963 until the time of trial." But we believe some proof in support of this assertion is essential.

did not have possession of appellee's stock, nor did it have control or the right to control Peoples' management of the loan or of the security, until April 21, 1964; and

(3) It is clear that PNB became the lead bank with the duty to administer the loan, received possession of appellee's security, and issued a Participation Certificate to Peoples on April 21, 1964.

 In view of the foregoing, PNB's wrongful *detention* of appellee's stock commenced either on April 21, 1964, as apparently found by the jury, or possibly on July 8, 1964, when an express demand for its return was made. Also, the jury's award of damages clearly appears to have been based on the value of appellee's stock in June 1963, as there was no evidence of its value as of April 21, 1964.

Consequently, we believe that the jury's verdict in Slaughter's suit against PNB was also "perverse" and cannot stand. Because the jury did find liability on the part of PNB for wrongful detention, at least as of April 21, 1964, Slaughter should be afforded the opportunity to prove damages, if any, as of that date.[21] As noted previously in note 12, *supra,* the more basic issue of the discharge of Slaughter's liability, a factual question of intent, would also be subject to redetermination in a new trial.

The order of the district court will be reversed and the case remanded for a new trial[22] in accordance with this opinion.

---

21. As plaintiff-appellee did not appeal the lower court's deletion of punitive damages, such damages may not be considered on appeal or in the new trial.

22. While appellant has asked only for a judgment n. o. v., having withdrawn its request for a new trial, 290 F.Supp. at 235, we may on our own grant a new trial where error below is shown and such relief is appropriate, just as the district court did with respect to the third-party action by PNB against Peoples. 290 F.Supp. at 235–236. *See* Neely v. Martin K. Eby Construction Co., Inc., 386 U.S. 317, 323–324, 329, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967), and F.R.Civ.P. 50(d) for the power to grant a new trial on an appeal from the denial of a motion for a judgment n. o. v.